Argued February 3, affirmed February 24, 1971

ASTORIA PLYWOOD CORPORATION,
*Respondent, v.* DEPARTMENT OF REVENUE,
*Appellant.*

481 P2d 58

*G. F. Bartz,* Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and Theodore W. deLooze, Assistant Attorney General, Salem.

*Lawrence M. Dean,* Astoria, argued the cause for respondent. With him on the brief were Macdonald, Dean & McCallister and Jeanyse R. Snow, Astoria.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE, HOLMAN, TONGUE and BRYSON, Justices.

TONGUE, J.

This is an appeal by the Department of Revenue from a decree of the Oregon Tax Court that the true cash value of plaintiff's plywood manufacturing plant at Astoria for the tax year 1968-69 was the sum $1,079,980. (4 Or TC 122) The county assessor had previously found the true cash value of the plant to be $1,678,100. On plaintiff's appeal to the Department the value was reduced to $1,513,400. Plaintiff alleged that the true cash value did not exceed $730,941.

The single assignment of error by the Department of Revenue is that the Tax Court erred in placing a value of $1,079,980 upon plaintiff's plant "in the absence of competent evidence in the record to refute the qualified appraisal of defendant," that there was

"insufficient evidence in the record to overcome the presumption of correctness of the finding of value of the department." The disagreement between the parties relates primarily to the proper method to be used to determine the true cash value of the machinery and equipment in plaintiff's plywood plant, the parties being in agreement upon the value of the land and buildings.

The Department offered a single witness, one of its industrial appraisers, together with the appraisal report prepared by that witness. The method used by this appraiser, in general, was to determine the replacement cost (new), less depreciation, for each of the various and numerous items of machinery and equipment in the plywood plant. He testified that he used that method because "to my knowledge" there were no comparable sales of plywood plants as "operating units" that continued to operate. He also conceded that he made no effort to find out if there were any comparable sales of plywood plants and that after completing the appraisal he learned of one such sale.

Thus, for each item of equipment, the Department's witness began with the "new replacement cost" (as of 1968, not the original cost), as found in catalogues issued by manufacturers, dealers or suppliers, using an "industrial discount" of 15%, and then adding freight and estimated installation costs, also as of 1968. He then deducted depreciation on a 20 year "straight line basis" (i.e., 5% per year) and adjusted the result by "observation as to condition" of the particular item of equipment.

This method was used despite the fact that some of the items of machinery and equipment had been purchased by plaintiff as used equipment and without regard to the market value of plywood plant

machinery and equipment as used machinery and equipment. Indeed, the Department witness conceded that he "assume(d)" that there was "a going market" for such used machinery and equipment, but said that there were no "published used equipment prices." He also conceded that the Department had information relating to auction prices for such equipment, including "a file cabinet with all the auctions filed in that as to company name," but said that this information was used only as a "cross-check" on "some items."

By the application of this appraisal method, the Department's appraisal report was to the effect that plaintiff's plant had a true cash value as of January 1, 1968, of $1,510,900, including $1,238,700 in machinery and equipment.

In opposition to such testimony, plaintiff offered the testimony of Mr. James Shull, a witness who had been engaged for many years in the purchase and sale of used machinery and equipment for sawmills and plywood plants. He had also built, purchased and sold entire sawmills and plywood mills and had appraised such mills for purchase and sale. This witness (who was plaintiff's principal witness) and another witness called by plaintiff (also with considerable experience in the purchase and sale of plywood plants as an accountant and consultant for plywood companies) testified that there was a market for used plywood machinery and equipment; that there were several dealers in Oregon who buy and sell used sawmill and plywood plant equipment; that several plywood plants had been sold at prices determined by the value of the plant machinery and equipment as used machinery and equipment, plus the value of the land (including buildings), and that usually there was no significant

difference between prices paid for plywood plants that had shut down operations and plants still in operation, but with no substantial timber supply, such as plaintiff's plant, so as to require the purchase of logs on the open market.

Plaintiff's principal witness, Mr. Shull, then testified that he had reviewed the state appraisal report, including its valuation of each of the many items of machinery and equipment, with particular attention to over 60 "stand-out items." He testified that the state appraiser used the "full list price," instead of applying the discount given to industrial users for new equipment, often as high as 50%. He also testified that even for items which were several years old and which plaintiff had originally purchased as used equipment, the state appraiser had used the 1968 new retail price for such equipment, thus "over-pricing it twice." In addition, this witness criticized the state's use of a "straight line" depreciation for a 20 year period (or 5% per year from the year of purchase), despite the fact that many items of equipment were as old as 40 years old, but had been purchased as used equipment in recent years. He also pointed out that the state's appraiser, apparently based upon the "observation factor," had appraised some of such items of equipment at 50% or more of the price of new equipment.

For these and other similar reasons, plaintiff's witness testified that the state had appraised many items of machinery and equipment at from two to five times what he testified to be the market price of the same items as used machinery and equipment. He also testified that many items of equipment could be purchased new for less than the state's alleged replacement value, less depreciation. For some items, how-

ever, plaintiff's appraiser did not consider the cost of wiring, "controls" and other installation costs. He also conceded that many items had been fairly appraised by the state, but contended that most items were overvalued.

By the application of these methods plaintiff's witness testified that plaintiff's plywood plant had a true cash value of $450,000 and not over its book value of $760,000, including land, buildings, machinery and equipment. It appeared, however, that plaintiff had recently spent $700,000 in modernizing one section of its plant. It also appeared that plaintiff's plant was still operating as a cooperatively owned enterprise, despite the fact that many major items of equipment were "out-moded," compared with competing plywood mills, and with the added handicap of purchasing its supply of logs on the open market from as far away as Kalama, Longview and the Mt. Hood National Forest.

The Tax Court, after listening to the testimony of both the state's appraiser and plaintiff's principal witness, Mr. Shull, was impressed with the experience and testimony of Mr. Shull and found that "his testimony established that the replacement values used by the defendant were excessive in many instances and that the true cash value assigned by defendant to the subject property should be reduced." On the other hand, the court also rejected the valuation of the plant by plaintiff's contention and held that the plant had a true cash value of $1,079,980.

In support of the position of the Department that the Tax Court erred in placing such a value on plaintiff's plant and that there was no "competent evidence in the record to refute the qualified appraisal

of defendant," it is first contended that "value for assessment purposes means the value of the plaintiff's plant as an operating concern and not the salvage value of its component parts." Thus, it is urged that ORS 308.205 provides that "with respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property" and that in the absence of recent sales of comparable properties the proper method to determine such value is "the current cost of reproducing a property less depreciation from deterioration and functional and economic obsolescence." It is also urged that in *Georgia-Pacific Corporation v. State Tax Commission,* 228 Or 112, 363 P2d 1104 (1961), this court held that the state's appraisal, based largely upon the reproduction cost of various parts of the mill, less physical depreciation, was proper and that the method of valuation used by petitioner's appraisers in that case, based on "salvage value," was "an improper way to evaluate a going plant."

The *Georgia-Pacific* case (in which this court adopted the opinion of the trial judge as its opinion) does not control our decision in this case for a number of reasons:

(1) That case involved not only an operating mill complex, but one with a substantial timber supply, and no contention was made by the petitioner in that case that there had been comparable sales of such mills. On the contrary, this case involves a mill without any substantial timber supply and there was testimony that the basis for selling such a mill is substantially the same as for mills which had closed operations and that there had been comparable sales of such mills.

(2) In that case no evidence was apparently offered to establish the fact that there was an active market in used sawmill or plywood plant machinery and equipment, while in this case substantial evidence was offered to establish that fact, which was not denied by the department's appraiser.

(3) In that case it appears that the petitioner's appraisers based their opinions upon "salvage value," while in this case plaintiff's witnesses testified that "salvage value" has the connotation of "scrap value," on a per pound basis, as distinct from the value of machinery as used equipment, to be reconditioned and resold.

Our decision in this case is controlled, however, by our subsequent decision in *Portland Canning Company v. State Tax Commission*, 241 Or 109, 404 P2d 236 (1965), unless that decision is to be overruled as incorrect. In that case, which involved two food canning plants, and despite contentions by the taxpayer that the proper method was the "market data approach," in which value is based upon the sales price of comparable properties which have been sold recently, as in this case, the State Tax Commission (now the Department of Revenue) insisted, as in this case, that the proper method of evaluation of the plant machinery and equipment was to use the "cost approach," by taking the replacement cost new and subtracting depreciation because of age and obsolescence.

In *Portland Canning* this court expressly rejected that contention in holding as follows:

"Clearly the dominant note of the legislation is that, if possible, value is to be ascertained in accordance with market value. While the commission has been given power to make regulations setting

forth procedures as to how this may be done, it cannot vary the mandate of the law under this guise. If a market existed for the kind of property being assessed, the property had to be evaluated by the market data approach. *The commission has no power to permit the evaluation of the property by the exclusive means of the cost approach to determine the value to the owner when a market in fact exists.*

"It is our opinion, after a perusal of the transcript, that there was a market for the majority of the canning equipment which was appraised. The Tax Court was correct in so deciding and, in addition, finding that the commission had used the wrong method in evaluating the property. Admittedly, it was a highly specialized market with which only a limited number of persons, who dealt in the business on a daily basis, were familiar. However, such market did exist and the burden is placed by statute upon the commission and the assessor to use market values if they exist. The commission objects that no price lists were published of which it could avail itself and that the market value of the used article depends upon its condition and this would necessitate its appraisers going about the country familiarizing themselves with the value and condition of various used canning equipment so it could be compared with that of the taxpayer. There are people in the trade who already have a knowledge of the market value of used canning equipment depending upon its condition. The taxpayer offered the evidence of two of them at trial. *The commission must either educate its appraisers in the market or employ someone who is already familiar with it. It cannot for convenience or economy avoid its statutory duty.*" (Emphasis added)

Despite the controlling effect of *Portland Canning* upon the facts of this case, the Department's opening brief in this case does not refer to, but would

completely ignore, that case. It was conceded by the Department on oral argument, however, that unless *Portland Canning* is overruled, the decision of the Tax Court in this case must be affirmed. It is contended by the Department, however, that *Portland Canning* was in error and should be overruled "because it was based upon the assumption" that the only thing being valued was isolated pieces of personal property; that "the market for an operating plant is comparable sales of other operating plants," and that this court should apply the rule of the *Georgia-Pacific* case to the facts of this case, rather than the rule of the *Portland Canning* case.

In making these contentions, however, the Department would overlook not only the fact that its own appraisal report of the machinery and equipment in plaintiff's plant is based upon a separate valuation of each "isolated piece of personal property," as well as the fact that the appraiser conceded that there was an active market for used plywood plant machinery and equipment, but still made no effort to become familiar with it. In addition, the Department would ignore the evidence in this case that operating plywood plants with no substantial timber supply, as in this case,[1] are sold on the same basis as plants that are not in operation; that there have been comparable sales of such plants, and that such sales have been made the basis of a valuation of the machinery and equipment as used machinery and equipment, plus the value of the land (including buildings).

---

[1] It is contended by the Department that "the testimony actually establishes a good timber supply and shipping facilities." The evidence, however, was that plaintiff had only a three year timber supply of logs purchased on the open market to be shipped to plaintiff's plant in Astoria from Kalama, Longview and the Mt. Hood National Forest.

After reconsidering this entire problem, in the light of the record in this case, we are still of the same view as stated in *Portland Canning* and believe that our previous decision in *Georgia-Pacific* is clearly distinguishable from it for the same reasons as previously stated. Accordingly, we must again emphasize that in such cases as this the Department, in order to perform its statutory duty to appraise property at its market value, must either educate the appraisers in the market for used machinery and equipment or employ someone who is familiar with that market.

For the same reasons, we reject the contention by the Department that evidence of the recent sale of a single operating plywood mill was not sufficient "to make a market," since there was not only credible evidence relating to the sales of several plywood mills which were not in operation, but also credible evidence that sales of such plywood mills were made on substantially the same basis as sales of operating mills without substantial supplies of timber (as in this case).

■■ The remaining contentions of the Department are that plaintiff's witnesses were not "qualified expert appraisers"; that their testimony did not go to the value of the entire plant, but was "nit picking and unsubstantiated," whereas its own witness was the only "qualified expert" who used "the authorized appraisal technique of replacement cost less depreciation." As previously noted, however, while it may be true that the "appraisal technique" used by its own appraiser may have been "authorized" by the Department, the use of such a technique in such a case was directly contrary to the mandate of this court in the *Portland Canning* case. Conversely, plaintiff's expert witness, Mr. Schull, was qualified by long experience, if not by "technical training," to testify on the subject

of the market value of used plywood mill machinery and equipment, in accord with our decision in that same case. Indeed, it was well within the discretion of the Tax Court, in the first instance, to pass upon the qualifications of the expert witnesses called by both parties and to weigh the credibility of their testimony.

In any event, as held by this court in *Knappton Towboat Co. v. Chambers*, 202 Or 618, 628, 629, 276 P2d 425, 277 P2d 763 (1954):

> "The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

It should thus also be noted again that the Tax Court did not completely accept or reject the testimony of either witness, but after considering and weighing all of the testimony arrived at what it found, in its best judgment, to be the true cash value of plaintiff's entire plywood plant for the tax year 1968-69. We have reviewed the entire record de novo and agree with that decision.

Affirmed.