# AVISON LUMBER CO. *v.* DEPARTMENT OF REVENUE

Jerome S. Bischoff, Dusenberry, Martin, Bischoff & Templeton, Portland, represented plaintiff.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered May 25, 1972.

CARLISLE B. ROBERTS, Judge.

Plaintiff appeals from the Department of Revenue's Order No. VL 71-223, affirming the value approved by the Clackamas County Board of Equalization on plaintiff's sawmill at Molalla, Oregon, as of January 1, 1969. All of the real property of the plant, including the improvements thereon, was involved in the appraisal, but the appeal relates only to the improvements (buildings and sawmill machinery), the value attributable to the bare land having been accepted by the plaintiff. The assessor placed a value upon the improvements of $1,342,500; the plaintiff prays for a reduction to a sum not to exceed $561,747 and, at trial, contended for a value not to exceed $536,440.

Plaintiff's complaint, filed in the court on May 27, 1971, was an appeal from the Department of Revenue's decision of March 29, 1971, affirming the assessor, and it attacked the Department of Revenue's original appraisal, dated November 2, 1969 (apparently prepared shortly before oral argument was heard by the department at its administrative hearing on November 12, 1969). A virtually new appraisal was prepared by the defendant for this case.

On February 24, 1971, the Oregon Supreme Court handed down its decision in the case of *Astoria Plywood Corp. v. Dept. of Rev.*, 258 Or 76, 481 P2d 58 (1971), to which the plaintiff refers in its complaint. In that case, the Supreme Court pointedly admonished the Department of Revenue and its appraisers for technical errors. A witness for the department in the present case testified that this stimulated his unit of the department's industrial appraisers to prepare and present a new appraisal in this appeal, dated January 10, 1972 (directed, of course, to the assessment date of January 1, 1969), which, while not agreeing with the plaintiff's contentions, gives particular consideration to them and takes them into account in an appraisal report which the court recognizes as unusually complete and detailed. The defendant is entitled to do this under the provisions of the appeal provided in ORS 305.425(1) for a trial de novo. The testimony in the *Astoria Plywood* case is readily distinguished from that in the present case because of the extensive records made by both plaintiff and defendant herein.

The subject property, a sawmill complex, includes three tax lots at two locations: Avison Mill No. 1,

at the southeast corner of the City of Molalla (Assessor's Account No. 34439), consisting of 2.92 acres; Avison Mill No. 2, at the southwest corner of the City of Molalla, located six or seven blocks from Mill No. 1, consisting of 10.82 acres (Assessor's Accounts No. 33638-1 and 33622). These mills were once independent of each other but now are owned by a closely held corporation which had invested in them more than a million dollars of new capital during the years 1963-1969. The complex includes both old and new buildings and both used and relatively new machinery but the testimony was undisputed that all parts are in good working order and that the management is experienced, capable and efficient. The mill has never had any substantial amount of timber of its own throughout its history (which, with its predecessors in interest, goes back to 1937). Mr. Robert E. Avison, the president, has personally engaged in buying timber and logs since 1946.

One of plaintiff's chief contentions in seeking a reduction in assessed valuation related to its lack of ownership of a log supply, thus allegedly rendering its situation precarious in a highly competitive industry, which is often endangered by fluctations in the market for lumber. But the same witnesses, with corroboration from the defendant, pointed out that many sawmills operate without the ownership of timber, that this situation is not new, and that plaintiff was able to obtain continual financing from an organization expert in the sawmill economy which was satisfied with plaintiff's ability to obtain raw materials. The testimony showed that, during the period 1966-1970, 149 out of 202 Oregon mills obtained from 90 to 100 percent

of their supply of timber from government sources.[1]

Another contention of plaintiff is that the plaintiff's conventional mill is outmoded by technical innovations in the industry, involving thin-kerf sawing and computer operation of certain machinery. The testimony was not convincing and the court finds that the preponderance of the evidence shows that a devaluation of currently used machinery for this reason would be premature.

Probably the greatest divergence between the parties was in the valuation placed upon the equipment and machinery. The plaintiff's view is that it must be placed on the assessment rolls at salvage value.

Plaintiff introduced, as an expert witness, Mr. Clyde P. Carroll, Jr., a buyer and seller of used sawmill machinery for over 20 years. His great experience and honest opinions are entitled to the highest respect regarding the availability and value of secondhand sawmill equipment. He did not appear to be familiar with the techniques of the trained appraiser who is knowledgeable respecting the several customary approaches to value, with their inherent strengths and weaknesses. His approach admittedly differed from that of the defendant in that he testified from the viewpoint of a broker in used sawmill machinery, accustomed to managing auctions for liquidation purposes. His values were based on an "as is, where is" figure and contemplated a "market" totally different from that which was subject to evaluation for the plaintiff as the operator of a going concern.

---

[1] For an enlightening study on the problems of log supply, see Mead, *Competition and Oligopsony in the Douglas Fir Lumber Industry*, Univ. of Calif. Press, Berkeley (1966), referred to in the testimony of the defendant.

It is clear that the market value which the assessor must determine, pursuant to ORS 308.205 and the Department of Revenue's regulation, R308.205-(A), relates to many different "markets." See *Arnold v. Dept. of Rev.*, 4 OTR 174 (1970). Mr. Carroll agreed that his market was that of the liquidator and, accordingly, his values did not include freight and transportation to the site, footings and foundations, installation, increments for wiring and piping, grading and paving, and all the other details (involving substantial capital expenditure) that require completion before the unit of property is capable of production. He testified that an addition of at least forty percent of the cost of the unit should be added for these requirements to determine the cost to the owner of an operating mill. (Testimony by defendant's witness showed the capital investment in a chipper purchased used, in place, for $15,500, at auction, increased to $107,723.58, installed and ready for use in an operating mill; similarly, a used barker purchased for $55,250 increased to $104,820. Tr 456.)

The defendant placed its values in the market of the operator of a "going business or concern." (For definition, see *Public Market Co. v. Portland,* 171 Or 522, 580, 130 P2d 624, 138 P2d 916 (1943). The court agrees with the defendant that the market to be used in the present case is the market of the operator of a going concern, whose capital investment includes payment for buildings and machinery erected and installed on the premises, ready for operation. As stated by the court in *R.L.K. and Co. v. Tax Commission,* 249 Or 603, 606, 438 P2d 985 (1968):

"* * * But we are not concerned with a *sale* of property in this case; the evaluation is made for

the purpose of *taxation*. The value of property is in its use. * * *"

The liquidator of property is not only dealing with a different market; he may or may not be the "willing seller" contemplated by the statute and regulations. Machinery in an abandoned property may or may not have any economic value.

In the *Astoria Plywood* case, the Department of Revenue contended that the value for assessment purposes of industrial machinery meant the value of the taxpayer's plant "as an operating concern and not the salvage value of its component parts." This contention was not overruled by the Supreme Court but it is apparent that in the trial of that case the department failed to produce the preponderance of acceptable evidence which would overcome the values asserted by a witness who was expert in the used plywood machinery market. The department apparently had made no effort in that case to find sales of comparable plants; it appeared uncertain as to industrial discounts of catalog prices of plywood mill machinery; it did not show familiarity with the used machinery market or with auction sales of such machinery; and it did not show that the cost approach was made necessary by a lack of market data respecting comparable values, as required by *Portland Canning Co. v. Tax Com.*, 241 Or 109, 113, 404 P2d 236 (1965), where the court said:

"Clearly, the dominant note of the legislation is that, *if possible,* value is to be ascertained in accordance with market value. * * *" (Emphasis supplied.)

In the present case, the defendant made an exhaustive study (see Def Ex B 12-22) and has found that many sales of sawmills have been and are being

made in Oregon for purposes other than liquidation. Six recent sales of mills without timber were selected as "comparable sales" because of similarities to the subject property and their continuation as going concerns after sale. However, rigorous cross-examination revealed the difficulty of using the market data approach to value these highly specialized plants. The defendant wisely refrained from making this ordinarily favored approach its chief reliance here, restricting "sales" to a value weight of .35 in its correlation. See Def Ex A 10.

Another argument advanced by plaintiff was that the assessor's value attributable to the mill could not be justified when considered in relation to the mill's average income from sales of its products. The testimony adduced by the plaintiff with regard to the income approach lacked the fundamental information essential for a sound conclusion. See Friedman, ed, *Encyclopedia of Real Estate Appraising* 36, ch 3, (Prentice-Hall, Inc., Rev. & Enlarged Ed, 1970). Plaintiff, attempting an income approach, used plaintiff's average "income" over several years, based on net profit after taxes. This method overlooked the necessity of adding back depreciation, property taxes and interest expenses to determine the capital necessary, at an approved rate, to obtain a return to pay for these charges as well as net income (after which an allocation would be required to find the amount attributable to the subject property from the total income of the entire operation). An investor, using the income approach, will expect a return of his capital through depreciation and salvage, interest on the use of his capital and repayment of expenses and taxes, looking at the entire operation, without restriction only to the property subject to property taxes.

The defendant also considered the income approach, using an acceptable formula, but utilized it in its correlation at a value weight of only .05. As stated by the defendant in its appraisal report (Ex A 10):

"The income approach has generally been held by the courts to be of negligible importance in valuing special purpose, owner-operated properties when other valuation data is available and appropriate. These properties are unique and do, in the course of producing a return of the invested capital, involve many agents in production. The credibility of the approach is reduced by the necessity of allocating income, that is generated from the 'whole' property, to the segment described as our 'unit of property.' * * *"

The income approach is appropriate to investment properties, particularly rentals consisting of multifamily apartment houses, office buildings, warehouses and the like where the lessee pays a rent (the income) which is not affected by such inchoate qualities as the lessor's management, availability of working capital, investment, markets, goodwill and other intangible factors, not subject to property tax, which cannot be disregarded but are very difficult to separate from the income stream. See the Oregon State Tax Commission's "Industrial Appraisal Manual" 73-76 (1965). The defendant's allowance of a value weight of only .05 to the income approach in the present case appears wise.

In this state of facts, the cost approach to value the buildings and machinery appears the most tenable. It was used by both the plaintiff and the defendant (although with different concepts of what constituted the market). The cost approach is a method in which the value of a property is derived by estimating the

replacement cost of the improvements, deducting there-from the estimated depreciation and then adding the value of the land, as estimated by the use of the market data approach.

The court recognizes that there have been instances in which the use of the cost approach for the valuation of an industrial plant has been frowned upon. See *U. S. Steel Corporation v. Board of Assessors,* 422 Pa 463, 223 A2d 92 (1966), and the criticism thereof. in XXXVI The Appraisal Journal 228 (April 1968). In 1 Bonbright, *Valuation of Property* 150 (The Michie Co., 1937, reprinted 1965), the noted author states that nearly always in theory and often in practice replacement cost has been recognized as mere evidence of value—fallible evidence at that. "One can even find cases in which testimony as to cost of replacement, if not held formally inadmissible, has at least been practically ignored in favor of valuations based on capitalized earnings or on other data." However, he goes on to say (at 151) that it would be utterly disastrous to ignore replacement costs as they have a significance, not possessed by any other data, in setting the *upper limit* beyond which a replaceable property may not fairly be valued. Again (at 157), the author observes that the maxim that replacement cost of property sets the approximate upper limit of its value is the most useful rule of thumb in the entire field of appraisal! Since a sawmill is a special-purpose property and there is no "average" special-purpose property, a step-by-step comparison of property "as it is" with a theoretically perfect property as a base (typically used in the cost approach) lends greater weight to the expressed judgment of value in this type of case. The market value approach assumes a continued use of

the properties in similar pursuits by the purchaser as by the present owner. The mere lack of market transactions does not justify the use of its salvage or scrap value.

Friedman ed, *supra,* in ch 20, comments on the appraisal of industrial property, indicating that heavy industry (which would include sawmills) gives rise to the "most complex problems in the industrial field" (at 453). Such properties have a lack of speculative value and so there is no constant market developed by speculators who create an "exchange" for a complete plant. The lack of this facility in industrial property results in a more variable market, with greater price fluctuations. On page 1011, the author states: "In many modern industrial plants, the structure and the machinery and equipment are an integral part of each other, neither having any appreciable value if separated. The appraisal of such properties requires an industrial expert, * * *."

Useful insight into the appraisal of industrial property can be gained from an examination of the State Tax Commission's "Industrial Appraisal Manual" (*supra*); Buscher, *Legal Valuation of Fixture Realty,* XXXIX The Appraisal Journal 239 (April 1971); Armstrong, *Is the Cost Approach Necessary?,* XXXI The Appraisal Journal 71 (January 1963); Hogan, Jr., *The Technique of Industrial Property Valuation,* XIX The Appraisal Journal 89 (January 1951).

As has been stated, the plaintiff has labored diligently in its presentation to the court and made an extensive record but its witnesses often contradicted or diluted each other's conclusions. The defendant, heeding the suggestion of the court in the *Astoria Plywood*

case, has immersed itself in the appraisal problems presented in the case in its efforts to evaluate the subject property. It has used all the approaches to value normally accepted by the appraisal profession and the courts; in the case of the cost approach, it has used three different techniques: reproduction costs, new; replacement costs, new; and replacement costs, used (the latter having been suggested by the *Astoria Plywood* case); and has shown data which support its subjective conclusions by a preponderance of the evidence.

At the trial, plaintiff, on the ground of hearsay, objected to the admission in evidence of defendant's Exhibits D and E, an appraisement of the plaintiff's plant in March 1967 by the General Appraisal Company, made on order of the plaintiff. The court reserved decision for the reason that appraisals are made for so many different purposes that a good foundation must be laid for their admission into evidence in a particular case and the hearsay rule is important in that aspect of admissibility. The adoptive admission exception was not urged. Therefore, the court has sustained the objection and, accordingly, it did not examine the exhibits. (The president of the corporation testified that as of January 1, 1969, the buildings and equipment were insured for $1,750,000, but the court has not found it necessary to take this testimony into consideration.)

In accord with the defendant's revised appraisal, the true cash value of the subject property as of January 1, 1969, is found to be $1,270,000.