# ASTORIA PLYWOOD CORPORATION *v.*
# DEPARTMENT OF REVENUE

Lawrence M. Dean, Macdonald, Dean, McCallister & Snow, Astoria, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered April 21, 1975.

CARLISLE B. ROBERTS, Judge.

Plaintiff appealed from the defendant's Order No. VL 72-501, dated December 8, 1972. According to the order, the question presented to the Department of Revenue was the true cash value of certain real property consisting of a plywood mill and the land on which it was and is situated, located in Astoria, Oregon, designated as Assessor's Account Nos. 9CB89-68 and 8DA89-3. Three years were involved. Each party sought to establish the true cash value of the property as of January 1, 1969, 1970 and 1971. ORS 308.210. (By agreement of counsel, for purposes of trial, the case was combined with Tax Court case No. 853, involving the same parties and property for the tax year 1973-1974.) The court viewed the property.

The defendant's Order No. VL 72-501 states that no evidence was adduced at the departmental hearing respecting land value for the year 1971 and the land value was not at issue in the other years. It was necessary only to establish values for that part of the real property described as machinery and equipment and building and yard improvements for each of the years in question. The defendant's order affirmed the valuations placed on the assessor's roll but did not list or total dollar values. Plaintiff's complaint sets out the values on the roll of the county assessor as to plaintiff's "personal" [sic] property as follows: For 1969-1970, $1,160,350; for 1970-1971, $1,766,920; and for 1971-1972, $1,769,150. The plaintiff contends that this

property should be valued at not to exceed $642,968 for 1969-1970, $1,238,220 for the year 1970-1971, and $1,150,000 for the year 1971-1972.

The defendant's answer to the complaint is not illuminating as to amounts of value. It merely denies plaintiff's allegations. However, at trial, it appeared' that no personal property was involved in the case; that the value of that part of the real property designated "improvements, machinery, equipment or fixtures" (see ORS 307.010(1)) was contested and there was no dispute as to the bare land value or the building and yard improvements. The court has proceeded accordingly and has sought, as best it could, to determine from the record the values actually in dispute.

The values alleged by plaintiff in its complaint, as taken from the county assessment roll, are found by the court to be identical with the amounts set forth in Defendant's Exhibit B, pp 234-236 and 238-240, as the total values of buildings and structures and affixed machinery and equipment found in Assessor's Account Nos. 9CB89-68 and 8DA89-3. Deducting the undisputed buildings and structures values shown in Exhibit B from these totals would presumably give defendant's asserted true cash values of the machinery and equipment on the assessment dates as follows:

| | 1-1-69 | 1-1-70 | 1-1-71 |
|---|---|---|---|
| Defendant's total values as pleaded by plaintiff and shown on Def. Ex. B | $1,160,350 | $1,766,920 | $1,769,150 |
| Defendant's undisputed buildings and structures values | — 289,700 | — 674,110 | — 682,280 |
| Remainder (necessarily representing defendant's machinery and equipment value) | $ 870,650 | $1,092,810 | $1,086,870 |

Following the same pattern, deducting defendant's building and structure values from plaintiff's pleaded values of "personal property" (read by the court as plaintiff's total values of "buildings and structures" and "machinery and equipment" for both tax accounts), plaintiff's presumed machinery and equipment values are found:

| | 1-1-69 | 1-1-70 | 1-1-71 |
|---|---|---|---|
| Plaintiff's total values | $ 642,968 | $1,238,220 | $1,150,000 |
| Undisputed buildings, etc., values | — 289,700 | — 674,110 | — 682,280 |
| Value of machinery and equipment | $ 353,268 | $ 564,110 | $ 467,720 |

As an aid to understanding the case, note should be taken that ORS 306.126 provides that the defendant Department of Revenue and a county assessor, in consultation with each other, may agree that the department shall provide the services of "qualified appraisal engineers" to the county for the purpose of appraising the principal industrial properties situated therein, the cost being divided by the state and the county. The defendant's published rules (designated as Regs. until 1971), OAR 150-306.126(1)-(A) through OAR 150-306.126(2), implement the statutes with definitions, the basis for determination of state responsibility, and other methodology. The legislature's continuing intent to provide such service to the counties is revealed in a review of the statutory amendments enacted since the inception of the original provision, each of which shows a legislative desire to provide more aid to the counties than was allowed by the earlier statute. *See* Or Laws 1955, ch 231, § 1; Or Laws 1957, ch 589, § 1; and Or Laws 1963, ch 85, § 1. It appears that the appraisal of the subject property was made the defendant's responsibility at the request of the Clatsop County Assessor.

In its effort to carry out the duties imposed upon it by the legislature, the defendant has set out in paragraph 5 of the department's rule OAR 150-306.126(1)-(A), a listing of basic information required for an appraisal of industrial property:

"Basic data and procedures in making appraisals normally include the following when applicable:
a. Location of property by tax codes and tax lot numbers
b. Map or sketch of land owned and layout of plant
c. Inventory of physical plant
d. Reproduction or replacement cost computations, as applicable
e. Analysis of depreciation
f. Analysis of economics as they affect valuation
g. Analysis of sales data when applicable
h. Field inspection
i. Research and familiarization with typical properties of the industry
j. Annual reports to stockholders
k. Fixed assets schedules
l. Income statements
m. Such other data that may affect value"

Paragraph 6 of the same rule sets out the "Basic Information for an Appraisal Utilizing the Annual Report Method." This paragraph has been supplemented in the defendant's publication, Oregon State Tax Commission, Valuation Division, *Industrial Appraisal Manual* (1965), a publication which is updated annually by the release to assessing officials of current cost factors and trending modifiers. Pages 139-142 therein describe the method of maintenance of the industrial appraisal estimate by the "Report Method." Pages 143-147 are replicas of the defendant's "Real Property Return," Form VD-C-31 (presently designated Form No. AA-C-31), and its accompanying computation

sheet, Form VD-C-89 (now A&A-C-89). An examination of this material is pertinent to an understanding of the testimony presented in court.

The Legislative Assembly has recognized that assessing officials are not sufficiently budgeted or staffed to appraise each item of taxable property each year. ORS 308.234 reads:

"The county assessors shall preserve in their respective offices records to show when each parcel of real property was last appraised. Each parcel of real property shall be appraised at least once every six years to insure that equality of taxation according to law shall be secured."

As stated in the defendant's *Industrial Appraisal Manual, supra,* at 139:

"The same law also applies to industrial property, but the dynamic characteristics of this type of property necessitate additional appraisal maintenance consideration. Industrial plants can and do change dramatically in a relatively short space of time as they are modified, modernized and/or expanded to meet the challenges of our competitive, economic system. It is therefore deemed essential to provide an annual appraisal maintenance program for industrial properties to accommodate not only the additions and deletions of real property improvements but also the depreciation of these properties."

The method designed by the defendant to maintain the industrial appraisals after an initial complete appraisal has been made by the Department of Revenue is to prepare annually the Form No. AA-C-31 (the "Real Property Return") and send necessary copies to the contracting county assessors, each copy bearing on its cover the identification of a particular taxpayer by name, location, and account number, and the applicable date. The assessor places the pertinent copy in the hands of each taxpayer at a time which will make it

possible for a return to be made to him on the report form on or before March 3 of each year, containing the taxpayer's own notations as to additions and retirements of property, including each item of machinery and equipment. Those reports which are marked for state responsibility are forwarded by the assessor to the defendant for the purposes of making the necessary estimates which, when completed, are then given to the assessor for insertion into the current assessment roll.

Upon receiving this material from the county assessor, the defendant's "qualified appraisal engineer" (defined in paragraph 4 of defendant's rule OAR 150-306.126(1)-(A)) takes from defendant's files the last physical inventory of the taxpayer's machinery and equipment, and the computations of the true cash value determined for the preceding assessment date, and makes the necessary modifications. The first step is to remove those items from the inventory which have been "retired" by the taxpayer during the new taxable year, deleting the values, following the prescribed method of the *Industrial Appraisal Manual, supra,* as required in subparagraph C, at 140:

"* * * If the description of the retirement unit permits identification in the last physical appraisal, the appraised value, trended and depreciated to date, will be entered in this column. When identification is not possible, an estimate of value is made based on the information furnished and/or a general knowledge of the equipment and its economic usefulness. Book value is not always a valid figure although it might conceivably coincide with the true cash value estimate."

The defendant's principal witness in this case testified that telephonic or written communications were regularly used by the defendant's Industrial Section to clarify ambiguities in the taxpayers' Real Property Returns.

The value that remains following the deletion of retirements is then increased on the basis of "the cost index multiplier," described in the *Industrial Appraisal Manual, supra,* in subparagraph D, at 140:

"* * * This factor, derived from the Marshall and Stevens, Inc., Valuation Service (Los Angeles), represents the average annual increment of change in the cost indexes. As a multiplying factor, its function is to correct the true cash value to conform with the yearly change in the cost base or the cost of materials and labor that comprise the industrial plant. Without the application of this trending factor, the maintained appraisal estimate could become unrealistic[,] especially in times of rapid inflation or deflation. Further, without trending there would be a marked degree of inequity between the maintained appraisal and the recent physical appraisal which is predicated on current costs as a basis for the value estimate."

Following this transaction, the inventory is further updated by listing additions as indicated in the taxpayer's Real Property Return, either using the values furnished by the taxpayer (if acceptable in the judgment of the appraisal engineer), or amended to compensate for either obvious deficiencies or the inclusion of inappropriate items, such as personal property or apparent maintenance charges.

A "depreciation multiplier," a factor intended to represent the annual rate of decline in the value of the real property improvements, is applied against the depreciable property. "It is derived from subtracting the decimal equivalent of the estimated depreciation rate in percent from one, or as an example, $1.00 - .04 = .96$." (*Industrial Appraisal Manual, supra,* at 140.) The manual further states that the appropriate depreciation rate is selected on the basis of the following considerations (each requiring a value judgment of the defendant's appraiser): classification of the prop-

erty, the kind of industry, the company's size and resources, the anticipated economic life of the plant, the quality of the real property, the maintenance and housekeeping practices, and company policies. This is designed to give "true cash value" as required by ORS 308.205. The rationale of the depreciation multiplier is found at 140-141:

> "The process of revising the estimate of true cash value each year by a depreciation multiplier representing the annual decline in value can be properly defined as the declining balance method. In terms of practicality, the system is a rational means of acknowledging the loss in value that technological change and the passage of time exact. Any nominal inequities that might develop in the value estimate during the six-year interim maintenance program will be corrected by the subsequent physical appraisal."

A summary of the reasoning or apologia of the department is given in these words, at 142:

> "In summary, the dynamic nature of industrial properties has more or less dictated an annual review of the appraisal estimate in the interest of equity as between industrial accounts and other properties. The need for the service is generally accepted. The problem has been one of executing a plan that yields a reasonable result without imposing undue clerical or administrative burdens. Although not without its measure of short-comings, the report method does satisfy the essential requirements of an appraisal maintenance program. It imposes an exacting reporting responsibility on the taxpayer. Actually, the correctness of the appraisal estimate depends greatly on the accuracy and completeness of the data in the Real Property Return."

Normally, the beginning figures annually used in the appraisal estimate for maintenance purposes in the case of industrial property would relate back to

the last physical appraisal of the plant. In this instance, the physical appraisal made by the defendant during the months of September and October 1967, to establish the true cash value of the property as of January 1, 1968, was the subject of an appeal to this court. *Astoria Plywood v. Dept. of Rev.,* 4 OTR 122 (1970). In that appeal, the court found the value of the machinery and equipment in Assessor's Account No. 9CB89-68 to be $797,900 and in Assessor's Account No. 8DA89-3, to be $9,880. These sums were affirmed on appeal to the Oregon Supreme Court in *Astoria Plywood Corp. v. Dept. of Rev.,* 258 Or 76, 481 P2d 58 (1971). Apparently, in light of the court's decision, the beginning figure for January 1, 1968, for Assessor's Account No. 9CB89-68 was set at $797,900 and for Account No. 8DA89-3 was set at $9,880 by the defendant's estimator, allegedly Mr. John Stahl (see Def Ex D and Ex B, at 238). As has been related, the appraisal estimates shown by Defendant's Exhibit B for the two accounts for the years in question, for machinery and equipment, were: for January 1, 1969 (utilizing the Tax Court's January 1, 1968, values, as the point of beginning), $870,650; for January 1, 1970, $1,092,810; and for January 1, 1971, $1,086,870.

The defendant's Order No. VL 72-501 concludes "that the best evidence of the true cash value of the subject property on each of the assessment dates in question is the expert appraisal testimony of Mr. John Stahl [then a member of defendant's Industrial Section], which supports the valuations on the roll." However, Mr. Stahl did not appear as a witness in this case and the sole witness presented by defendant was Mr. Lloyd G. Honeysette, an appraisal engineer employed by the Department of Revenue in the Industrial Section of the Assessment and Appraisal Division during the last ten years. He testified that twelve persons work in that section with the duty to assist assessors

in the appraisal problems relating to industrial plants. Mr. Honeysette is a graduate of Oregon State University in engineering and has taken appraisal courses at Portland State University. He gained experience during twelve years as an estimator in general construction work and has been a construction engineer and superintendent and has installed heavy equipment, but has never bought or sold lumber or plywood mill equipment.

Although Mr. Honeysette had made some preparation for presentation of testimony in this case, his first acquaintance with and view of the subject property was for use in the subsequent January 1, 1973, valuation. He did not personally make the computations required for a maintenance appraisal, using the property tax returns for the years 1969-1970, 1970-1971 and 1971-1972. He apparently had not prepared the exhibits submitted. He candidly admitted that he did not know the source and did not understand the bases of the trending multipliers and depreciation multipliers used in the maintenance of the appraisal estimates for the property and years here in question.

█ Since Mr. Honeysette had not done any work as an appraiser or made any judgments of his own relating to the subject property for the years involved in this case, he experienced great difficulties as an adverse witness in answering counsel's questions. He was not familiar with the defendant's 1968 appraisal of values of the subject property for January 1, 1969, 1970 and 1971. Consequently, the only testimony before the court in support of defendant's position are Exhibits B and D, apparently prepared by Mr. Stahl, which defendant's sole witness was unable to explain except in general terms as to the method followed. The conclusions of value in the exhibit were those of a person not present in court and must be rejected as hearsay.

██ No evidence was presented to the court to aid it in a judicial appraisal of defendant's asserted values. Defendant's "report method" (Def Ex B), on which it wholly relied, may be solidly based, but this is not self-evident. The court cannot take judicial notice of the reliability of the multipliers (apparently the keys to the structure), annually established by the department, which were left a mystery by defendant's presentation in spite of a rigorous examination. An expert witness is expected to give a satisfactory explanation of the methods by which *he* arrived at his opinion and the basis for any formula used by him. *Chicago and North Western Railway Co. v. Hillard,* 502 P2d 189, 192 (Wyo 1972) ; *American Sav. Life Ins. Co. v. State ex rel. Herman,* 13 Ariz App 336, 339, 476 P2d 680, 683 (1970).

Mr. James Shull, the principal witness for the plaintiff regarding the values of the subject property as of the assessment dates of January 1, 1969, 1970 and 1971, was particularly experienced in the valuation of new and used sawmill and plywood plant equipment and machinery. In the valuation case for 1968, this court observed: "He had purchased and sold many mills, constructed others, and had years of experience in buying and selling mill machinery and equipment. His experience and his testimony were highly impressive." *Astoria Plywood v. Dept. of Rev.,* 4 OTR 122, 123 (1970). His formal education included approximately two years of college engineering and mathematics. He testified in this case that he had appraised for both purchasers and sellers of mills, for establishing plant values for internal accounting controls, and in taxation cases. His clients in Oregon have included the giants of the industry. It has been some time since he himself bought a plywood plant. ("I believe back in early '60s, possibly '50s—late '50s.") His appraisal techniques do not fully conform to accepted models

and, for this case, he discarded significant work papers which were needed at the trial.

However, it appears that Mr. Shull has an intimate familiarity with all aspects of plywood machinery. He testified that he was able quickly to establish to his own satisfaction the value of each unit of equipment in the subject property for the January 1, 1968, appraisal (which he made in 1970) as to 95 percent of the value thereof. For new equipment added to the mill after January 1, 1969, he found that he had to rely upon the method described as "replacement new, depreciated" inasmuch as the newer equipment was not yet found in the used equipment market. He was familiar with the plaintiff's plant and had made a number of visits to it for his own purposes as well as for the purposes of the appraisals in this case. (After the Tax Court's 1970 decision as to the January 1, 1968, value of the property, which accepted most but rejected a few of Shull's values, he voluntarily spent a day in the plant, immediately after the decision was handed down in May 1970, to see where he had erred. He concluded that his appraised value of $450,000 for the whole plant had been correct.)

In valuing the plant and equipment for the years in question, he testified that he made a physical inspection and "went through and itemized every item," listing each by name, make, model, serial number, and as to pertinent details, immediately placing his valuation thereon as to 95 percent of the total value. He made further inquiry into the remaining items by the examination of catalog files and his own records of purchases and sales for the past five years. (After the court's decision for the 1968 value, having discarded his work papers, he based his preparation for this case to a large extent upon the description of the plant and machinery and equipment prepared by the Department of Revenue beginning October 5, 1967 (Pl Ex 7).)

While relying upon used equipment values where possible, he testified that he carefully distinguished the situation of used equipment in a going concern as opposed to salvage value, liquidation value, junk value, and the like. Under examination and cross-examination, he stressed that "equipment, replacement used" had to be a reconditioned, first-class machine, with new machinery guaranties, and must include the cost of transportation to the buyer's plant, the typically heavy installation expenses, and the cost and installation charges of necessary auxiliary equipment (controls, electric power, pipes, etc.) requisite to an operating unit in a plant. But he did use the reproduction costs new (espoused by the defendant) on equipment that was "newer than 1968, that was put in '69 and later." (A close study of the transcript of Mr. Shull's testimony will reveal minor contradictions under cross-examination which, after study, the court has resolved as indicated in the foregoing conclusions.)

For the appraisal of plant and equipment as of the assessment dates January 1, 1969, 1970 and 1971, Mr. Shull's method was similar to that of the defendant's "report method" but contained significant variations.

The testimony is not entirely clear but it appears, in the first instance (Pl Ex 15), Mr. Shull believed that, for his beginning point, he was required to adopt the Tax Court's January 1, 1968, values, a total of $1,079,980. To this, in each year, he added the additions of buildings and equipment, using figures derived from the plaintiff's records of actual out-of-pocket costs, and, from the total, deducted retirements of buildings and equipment at the rate of 50 percent of the value found for that year on the assessor's rolls. (He explained his retention of 50 percent of the retirement values during the subject years in a confused way but led the court to conclude that the sum involved was his substitute for the trending multiplier used by

the defendant in its computations under the report method.) From the result, he deducted 10 percent of the balance each year which, because it applied to a declining balance, he estimated to be in effect a 5 percent straight-line depreciation, with an estimated life of 20 years (which he deemed conservative since, in his experience, the average life of plywood equipment and, apparently, buildings, was 17 years).

On this basis, he found the value for the subject years as follows: January 1, 1969, $1,044,857; January 1, 1970, $1,492,224; and January 1, 1971, $1,362,082. (Pl Ex 15.) He made no effort in his testimony to allocate between machinery, equipment and buildings, having been instructed to appraise "a complete package." He had used work papers which gave him an allocation for the 1968 value and he had Plaintiff's Exhibit 7 which, together with the plaintiff's copies of the Real Property Returns for years ending December 31, 1968, 1969 to 1973, inclusive (Pl Exs 8-13, inclusive), made an allocation possible after some additional labor.

After roughing out his calculations, beginning with the court's January 1, 1968, valuation (Pl Ex 15), he was apparently advised by counsel that each year of appraisal could engender a new cause of action, and, as an expert appraiser, he could use his original January 1, 1968, valuation as a beginning point if he believed it to be the most accurate available. Thereafter, he prepared Plaintiff's Exhibit 6, beginning with the January 1, 1968, value of $450,000, which resulted in a substantially lower value for each of the succeeding years. The additions and retirements and the depreciation rule were followed precisely as in Exhibit 15. However, this court takes the view that the January 1, 1968, starting point must be that determined under the case of *Astoria Plywood Corp. v. Dept. of Rev., supra;* i.e., $1,079,980, as affirmed by the Supreme Court.

■ The court found the total record in this case to be more obfuscating than enlightening. It is evident that since the decision on the January 1, 1968, value, the Department of Revenue has gathered together a great deal of data and developed a formalized approach to value for use in such cases as this which could be formidable. But it failed to present the right witness. No testimony was presented to the court which carried conviction. (Cf Avison Lumber Co. v. Dept. of Rev., 5 OTR 45 (1972).) There is no presumption of assessment validity in the defendant's work. There is only a presumption that defendant's *procedural* steps were properly taken. See J. R. Widmer, Inc. v. Dept. of Rev., 261 Or 371, 377, 494 P2d 854 (1972). But defendant's witness was unable to justify even its procedural steps.

■ Mr. Shull's testimony lacked the art of the trained appraiser. Nevertheless, it contained more useful and acceptable testimony than the case presented by the defendant. After all, he was thoroughly schooled by experience in the practical aspects of the business of buying and selling the same kind of property as was the subject of this case. He was thoroughly familiar with the subject property, having visited it many times. His procedures appear reasonable and were not overturned by adverse testimony. Whereas the defendant presented no testimony of evidential value, the plaintiff presented *some* testimony which carried weight with the court, if not conviction. The plaintiff has met the burden of proof required by ORS 305.427.

Accordingly, the court finds the total true cash value of buildings and structures and affixed machinery and equipment found in Assessor's Account Nos. 9CB89-68 and 8DA89-3 to be as follows: January 1, 1969, $1,044,857; January 1, 1970, $1,492,224; and January 1, 1971, $1,362,082. Deducting the undis-

puted values of buildings and structures as developed by the defendant in each of the respective years, the value of machinery and equipment for each year is determined thus:

|                                                                      | 1-1-69      | 1-1-70      | 1-1-71      |
| -------------------------------------------------------------------- | ----------- | ----------- | ----------- |
| Plaintiff's proved total values                                      | $1,044,857  | $1,492,224  | $1,362,082  |
| Defendant's undisputed buildings and structures values               | — 289,700   | — 674,110   | — 682,280   |
| Value of Machinery and equipment                                     | $ 755,157   | $ 818,114   | $ 679,802   |

The assessor and tax collector of Clatsop County shall amend their rolls as required by the decision, allocating the values between the two accounts in the proportions presently represented therein, and making any necessary repayment of taxes overpaid, if any, with interest thereon, pursuant to ORS 311.806 and 311.812. Each party shall bear its own costs.