# IN THE OREGON TAX COURT

## HYSTER COMPANY
*v.*
## DEPARTMENT OF REVENUE
(TC 1914)
## WILCOX
*v.*
## DEPARTMENT OF REVENUE
## HYSTER COMPANY,
*Intervenor*
(TC 1926)

Russell T. Helterline and Clarence H. Greenwood, Helterline, Beck & Rappleyea, Portland, represented Hyster Company.

Paul G. Mackey, Assistant County Counsel, Multnomah County, Portland, represented plaintiff James P. Wilcox.

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiffs rendered August 6, 1985.

### CARL N. BYERS, Judge.

The above cases were consolidated for trial because they both concern the Hyster manufacturing facility in Portland. During the course of the administrative appeals of the land and improvement values, the land value was reduced. This resulted in Assessor Wilcox appealing the value of the land only in case No. 1926 and Hyster Company appealing the value of the machinery and equipment only in case No. 1914. (None of the parties appealed the value of the buildings and yard improvements.) For ease of identification, the parties will be referred to as the "county," the "department" and "Hyster."

The Hyster facility consists of a heavy industrial manufacturing plant located on a 15.2-acre site in Northeast Portland. (The value of only 14.13 acres is being appealed.) The plant was originally established in 1929 and consists of the usual buildings and machinery and equipment. The plant has been used by the company primarily to manufacture and assemble forklift trucks.

The dispute over the value of the land centers mostly on its highest and best use. The property is located in a neighborhood with relatively narrow streets and poor access for a heavy industry. In addition, the sprawl of the plant has resulted in public streets being part of the plant compound which creates some interference and security problems.

The appraisers for the county and Hyster agree that a party seeking a heavy industrial site would not locate on the

subject site today. As a result, the county appraiser concluded that the property had a highest and best use other than its current use. Hyster, on the other hand, viewed the improvements on the property as being too valuable to raze and concluded that the present use is the highest and best use.

*Land:*

The initial issue facing the court is whether it is appropriate to value the land as vacant and available, which permits the appraiser to find a highest and best use different from the use dictated by the improvements.

■ The difference in the approaches of the two appraisers appears to be simply a difference of direction. That is, both approaches seek the same true cash value. While they may differ in the values assigned to land and improvements, the overall result should be the same. For example, if land is valued as vacant and available and is determined to have a higher and better use than the use permitted by its improvements, the value difference between the land's current use and its higher and better use is a measure of economic obsolescence which is deducted from the value of the improvements. The resulting combined value of land and improvements should be the same as the value of the land and improvements valued on the basis of highest and best use as dictated by the existing improvements.

■ Assuming that the overall result would be the same, what reasons, if any, are there for choosing one approach over the other? The idea that land is "residual" in sharing the economic return is derived from economic concepts and analysis. American Institute of Real Estate Appraisers, *Appraisal of Real Estate* 249 (8th ed 1983). In this case the choice of one approach over the other perhaps should be less for underlying economic theory and more for the practical utilization by the tax system. It would appear that valuing land as vacant and available is the most logical choice. Under Oregon's ad valorem tax system, land is separately assessed and, as here, can be separately appealed. The vacant and available approach promotes uniformity in land values and permits accurate allocations of overall value between land and improvements. It would appear also to assist the appraiser in determining the highest and best use of the improvements. This approach

recognizes that it is the improvements which suffer diminution in value due to changes over a period of time. The reason for this, of course, is that it is the improvements, not the land, which restricts changing the use to the higher and better use.

■ Plaintiff cites *Oregon Broadcasting Co. v. Dept. of Rev.*, 287 Or 267, 598 P2d 689 (1979), and *Portland Golf Club v. Tax Com.*, 255 Or 284, 465 P2d 883 (1970), for the proposition that "bifurcated" appraisals[1] are not approved in Oregon. As the Supreme Court pointed out in *Bend Millwork v. Dept. of Rev.*, 285 Or 577, 592 P2d 986 (1979), adoption by the court of a method of appraisal in a particular case does not constitute a statement of a "legal principle." (285 Or at 586.) In *Portland Golf Club,* the court was concerned with the market value of the "whole property." Here, the land has been separately appealed and must be separately valued. As noted by the court, *Oregon Broadcasting Co. v. Dept. of Rev.* was a "unique case" where the improvements were not on the land which had a different highest and best use. *Supra,* at 282.

After reviewing the evidence, the court finds that the land has poor access and is not well suited for heavy industry. Again, the appraisers appear to agree that heavy industry should be located farther out from the core of the city. Based on the comparable sales and the evidence of the use of the surrounding land, it appears that the highest and best use for the subject land would be for warehousing and light industry. This kind of land apparently ranges in value from $100,000 to $200,000 per acre. In evaluating the comparable sales relied upon by each party, the court notes that the county's comparable sales are smaller than the subject and some of them have improvements on them which make them superior to the subject. On the other hand, Hyster's appraiser's comparable sales also were smaller than the subject. Because Hyster's appraiser determined that the land should be valued at its current use rather than a different highest and best use, he concluded that the land had a true cash value of only $41,000 per acre. (Tr 180.) Having found that the land should be valued based on a highest and best use for warehousing and light industrial, the preponderance of the evidence leads the

---

[1] The parties use the term "bifurcated appraisal" to describe valuing the land at a highest and best use which is different from the highest and best use ascribed to the improvements.

court to adopt the opinion of Mr. Gambee, finding a value of $2,267,125 for 14.13 acres.

Hyster argues that this approach violates the principle of "consistency."[2] Assuming that this concept has application in this case, the violation of economic principles which it seeks to prohibit is avoided by deducting the indicated economic obsolescence from the value of the improvements. In this case, the department's witness Rauh did so, utilizing $912,470[3] as the value of the land for its current heavy industrial use. However, although Rauh did include some comparable properties in his report (Exhibit A, section 11), he did not purport to have appraised the land. Rather, he described it as "a process" he went through to determine economic obsolescence. (Tr 634.) Based on all of the evidence of land value for heavy industrial use, the court finds that Abel's opinion of $579,000 is the most persuasive. Deducting this amount from $2,267,125 results in an indication of economic obsolescence of $1,688,125. If this amount is deducted from the value of the improvements, the total result is the same as if the land and improvements had been consistently valued for its current use. All this approach does, in this case at least, is to properly indicate the shift in values between land and improvements which is occurring by virtue of changes in the neighborhood.

Acceptance of the county's approach on land value requires the deduction of the indicated economic obsolescence from all of the improvements on the subject land, including buildings. Since Hyster agreed with the values placed on the buildings by the county, the buildings are not in issue in either case before the court. This, however, does not prevent allocation of a proportionate share of economic obsolescence to the

---

[2] "Properties devoted to a temporary, interim use give rise to a related concept, *consistent use*. According to this concept, *land cannot be valued on the basis of one use while the improvements are valued on the basis of another.* Improvements must contribute to the land value to have any value attributed to them. Improvements that do not represent the land's highest and best use, but do have substantial remaining physical lives, may have an interim use adding temporary value or may have no value at all (or even negative value if substantial removal cost would be incurred)." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 29 (8th ed 1983). See also example at 263.

[3] Rauh's current land value estimate was $912,470 (Exhibit A, section 2, at 34) but this was based on $1.37 per square foot for 15.29 acres. The correct acreage for computation and allocation of economic obsolescence is 14.13 acres.

buildings.[4] It should be noted, as pointed out by Hyster at the trial, the department has erroneously included the office building in its total estimate of value. In doing so, it has also allocated a portion of the economic obsolescence to that building. The evidence with regard to the highest and best use of the land does not suggest that the office building is inconsistent with that use. Accordingly, the court finds that no economic obsolescence should be allocated to the office building.

Because the buildings and yard improvements were not appealed, none of the appraisers testified as to their value. However, the department's appraiser, Mr. Rauh, used the figure of $3,530,130 as the total building and land improvement value, which was not disputed by any party. Based on finding total economic obsolescence of $1,688,125, and using the same ratio of buildings to total value and machinery and equipment to total value (Exhibit A, section MISC., at 34) after deleting the office building (Account No. 94390-0390), it appears that $400,256 should be allocated to buildings and $1,287,869 to machinery and equipment.

*Machinery and Equipment:*

Two expert witnesses testified as to the value of the machinery and equipment, both of whom utilized the cost approach. Mr. Slack, testifying for Hyster, based his appraisal on a replacement cost used approach, relying upon prices from the used equipment market. In considering the strengths of this appraisal, it is apparent that Mr. Slack is experienced in the used equipment market and has a good feel for market prices. The court was impressed by his evaluation of dealers which permitted him to rely on represented conditions of the equipment being priced. In some ways, this appraisal was more accurate than Mr. Rauh's. On the other hand, his lack of details and specifics in several areas weaken his overall opinion of value. Additionally, Mr. Slack indicated that he depreciated his installation costs down to 10 percent because he knew the plant was going to close. While this knowledge may have existed at the time he actually did the appraisal, the evidence

---

[4] On this point, the evidence is unsatisfactory. Both appraisers appear to have assumed that the buildings, which are now being used for heavy industry, could not be used for light industry and warehousing and would have to be razed. This assumption seems unwarranted, especially when the streets that run into various parts of the complex would facilitate "cutting up" the single complex for a number of users.

indicates that such knowledge could not have been known at the assessment date in question.

Mr. Peter Rauh, an experienced industrial engineer-appraiser for the state Department of Revenue, testified for the department. His appraisal was impressive by virtue of the detailed information on both new and used equipment. He also considered engineering fees and installation expenses which may have been omitted by Mr. Slack. The weaknesses discerned by the court in Mr. Rauh's appraisal appear in the form of errors in some of the listed equipment and misapplying factors to trended costs.[5] Also, Mr. Ben Hensley, one of the earlier appraisers involved on behalf of the department who has since left state employment, was not present to answer questions.

On the whole, weighing both appraisals in perspective, they are about equal in persuasive weight. In the final analysis, it seems the question is which approach best reflects the true cash value of the machinery and equipment? That is, is the price of new equipment depreciated for physical and functional obsolescence the best indication of market value or is it the price of used equipment?

Hyster adduced evidence showing that its Alabama plant was built primarily with used equipment. However, that equipment came from another Hyster plant which had been closed in Peoria, Illinois. The evidence also showed that Hyster purchased 80 to 90 percent of the equipment for the subject plant new. The process of weighing the new against the used equipment approach raises questions which are not answered by the evidence and perhaps cannot be. For example, does the fact that Hyster purchases most of its equipment new indicate or imply that Hyster's used equipment has less or more value to Hyster than the used market would indicate? Does Hyster's practice or preference for new equipment have any bearing on the market value of its plant? It would seem that although Hyster may have purchased the equipment new, if it is now

---

[5] Mr. Rauh's reliance on new equipment prices also seems somewhat exaggerated. He testified that he believed new prices were more "reliable" than used equipment prices because they were based on market surveys made by equipment manufacturers. However, the department introduced no evidence of any surveys. How a survey would relate to the older equipment which is no longer manufactured seems to call for some speculation.

used, as it is, the best indication of its value is what comparable used equipment sells for in the marketplace.

The department strenuously argues that the reproduction cost new (RCN) approach is more reliable than the replacement cost used (RCU) approach. Only two of the department's arguments will be discussed.

■■ The department argues that assembling machinery and equipment into an integrated operating facility creates a synergistic effect, testified to by Mr. Coxen, which results in value over and above the cost of the component parts.[6] The department also asserts that there is no appraisal authority for using data from the used equipment market for appraising an integrated, operating facility. The department cites *Maytag Company v. Partridge,* (Iowa) 210 NW2d 584 (1973), for the proposition that "aggregating prices of used machinery theoretically does not measure the value of 'similar' items in an integrated and operating facility." (Defendant's Trial Brief at 25.) While these assertions taken alone may be true, they do not dictate use of RCN over use of RCU. If the "synergistic effect" does exist in a facility, neither the RCN or the RCU approach alone will reflect it. Only by comparing levels of profitability to cost, either RCN or RCU, or by comparing comparable sales of whole facilities to cost, either RCN or RCU, can the existence of a greater value be discerned. It is *not the source of the cost data,* but the relationship between cost and some other indicators of value which discloses the synergistic effect. Whether any appraisal text approves the use of used equipment prices is unknown; it is sufficient that their use has repeatedly been approved by the Oregon Supreme Court. *Astoria Plywood Corp. v. Dept. of Rev.,* 258 Or 76, 481 P2d 58 (1971).

The department also argues against the use of the RCU approach because of the unreliability of used equipment prices and conditions. However, the variables in the RCN approach can be just as great and equally subject to question.

---

[6] Contrary to the department's assumption (Defendant's Trial Brief at 19), in the absence of any evidence on profitability, it is mere speculation as to whether any "synergistic" value exists. It is clear that if the integrated unit is not profitable or was not competently assembled, there may be a significant loss in value as to those items and costs which cannot be salvaged.

While it is true that Mr. Slack's lack of eye and touch comparison weakens his appraisal, so does the reliance by the department on quotations of prices by manufacturers for equipment which is no longer being manufactured.

Comparing the two approaches discloses that the areas of adjustment or judgment risk in each approach falls in different areas. Consequently the evidence can be weighed to determine which approach involves the greatest amount of adjustment or judgment. Specifically, the area of judgment risk in the RCN approach is in determining the amount of physical depreciation and functional obsolescence. This suggests that the greater the amount of physical depreciation and functional obsolescence estimated, the less reliable the method. On the other hand, the elements of risk and judgment in the RCU approach appears to be in determining the comparability of the condition of the used equipment with the subject equipment. There may be also an element of risk or judgment in determining prices from used equipment dealers, although such may be true for new equipment as well. Thus, the more variations in the conditions or prices of the equipment in the used equipment market the less reliable the method.

In this case, it appears that over half of the equipment was more than 10 years old. Both appraisers agreed that the general condition of the machinery and equipment was "average" or approximately 50 percent good. This evidence suggests that use of the reproduction cost new may be less reliable because of the large percentage of adjustment required for physical depreciation and functional obsolescence.[7] On the other hand, it is likely that the condition of the equipment in the used equipment market is probably comparable. The evidence indicated there is an established used equipment market, that the great majority of the subject equipment is standard industrial tooling or machine shop type of equipment and that within limits the dealers and prices may be relied upon. It appears from the evidence that it is unlikely very much of the equipment on the used equipment market would be less than "average" condition. Thus, the appraiser

---

[7] The department's estimate of the true cash value for machinery and equipment was $8,487,810 (including economic obsolescence), which represents approximately 47.6 percent of reproduction cost new.

who obtained his equipment costs from the used market was required to make few adjustments to achieve comparability, while the appraiser using reproduction costs new had to adjust such costs over 50 percent. Moreover, estimating functional obsolescence and economic obsolescence would seem far more difficult and prone to error than evaluating the probable condition or prices of used equipment. Accordingly, the court concludes that the replacement cost used approach has the greater weight in this case and that the indicated true cash value of the machinery and equipment is $6,705,000.

Based on the above findings, the indicated land economic obsolescence of $1,287,869 should be deducted from the machinery and equipment, leaving a net true cash value for the machinery and equipment of $5,417,131. None of the parties shall recover costs.