*[325]
 
 CARLISLE B. ROBERTS, Judge.
 

 On the motion of the Department of Revenue, supported by the affidavit of Mr. Glenn Coxen, Supervisor, Industrial Section, Assessment and Appraisal Division, Department of Revenue, State of Oregon, Mr. C. W. Knodell, Financial Vice President, Willamette Industries, Inc., was ordered to appear before this court, sitting in the U. S. Court of Appeals Courtroom, Pioneer Courthouse, Portland, Oregon, on June 15, 1979, to show cause, if any, why he had failed to comply with an Order to Produce Records served upon Willamette Industries, Inc., through Mr. Knodell, on April 4, 1979. The order requested opportunity for inspection by the Department of Revenue’s agent of records relating to the Duraflake Division of Willamette Industries, located at Millersburg, Oregon, for the fiscal years ending in 1974 to 1978, inclusive (for purposes of completing the appraisal of that plant for the tax year 1979-1980), as follows:
 

 "1. The annual production of particle board and surface square feet upgraded by painting, that is, processing and the remanufacturing section of the plant known as the 'paint line’ or 'coating and filling’ line;
 

 "2. The particle board production cost of the various work centers normally referred to as 'cost center’, that are typically a part of cost records. Examples are: raw material receiving, milling and drying, blending and mat forming, pressing, sanding, cutting, shipping, overhead, depreciation and selling expense;
 

 "3. The cost per ton assigned to various kinds of wood residue used as raw material for particle board, delivered to the Duraflake Division, furnished by plants owned or controlled by Willamette Industries, Inc., and the cost per ton using yearly averages delivered to the plant and purchased in the open plants owned or controlled by Willamette Industries, Inc., and the cost per ton using yearly averages delivered to the plant and purchased in the open market. The costs preferably expressed as a range
 
 *[326]
 
 from the lowest price to the highest price and an approximate average cost for each year specified;
 

 "5. [sic] Copies of profit and loss statements and balance sheets with available supporting schedules: For fiscal years ending 1974, 1975, 1976, 1977 and 1978.”
 

 Mr. Knodell duly appeared and testified. After testimony and arguments, the counsel for the two parties stipulated that the decision in this matter could be held in abeyance pending resolution by the Oregon Supreme Court on appeals then before it, taken from the Oregon Tax Court in
 
 In re Southern Oregon Cable TV
 
 (TC No. 1210-S, decided March 16, 1978),
 
 Frank Lumber Co. v. Dept. of Rev.,
 
 7 OTR 555 (1978),
 
 In re Eola Concrete Tile & Prods. Co.,
 
 8 OTR 128 (1979), and
 
 Eola Concrete Tile & Prods. Co. v. Dept. of Rev.,
 
 8 OTR 138 (1979). Decisions in these cases have now been rendered by the Oregon Supreme Court in 287 Or 35, 287 Or 513 and 288 Or 241, respectively, all in 1979. This court has provided that, following instruction from the Supreme Court in the above-entitled cases, further argument or additional testimony could be presented upon request of either counsel. Defendant’s counsel, in a letter dated February 13, 1980, and plaintiff’s counsel, in a letter dated February 25,1980, indicated that they now deemed the matter to be submitted to the court and that no further testimony or argument was useful or desired.
 

 Mr. Knodell’s testimony made clear that all of the records requested by the Department of Revenue could be made available except that, whereas item 3 referred to the "cost per ton assigned to various kinds of wood residue used as raw material for particle board * * the corporation’s books do not reflect costs per ton but by units of 1,000 board feet, three-quarter inch surface measure. This is a finished product, shown in the financial statement, and reference must be made to individual invoices to determine costs of raw materials. "We work on the sales price and work back on that basis.” (Tr 27.)
 

 
 *[327]
 
 Mr. Russell A. Smith, an appraisal engineer for the Department of Revenue, has worked in the pulp and paper industry for about 13% years as an industrial engineer and has been with the Department of Revenue for approximately 5% years as an appraisal engineer, during which time he has made appraisals of 75 to 100 plants. He testified that the books and records of the various plants which he has appraised are not systematized into uniform accounts and, consequently, when he initiated the request for the information desired of Willamette Industries, Inc., he sought only an opportunity for inspection of the records as kept by the company. He expected to make the necessary bookkeeping adjustments for purposes of comparison with other plants, to determine performance in the market.
 

 As stated by plaintiff’s counsel, the principal objection to the production of documents was "for the reason that their disclosure to competitors would be detrimental to the taxpayer.” (Tr 5.) Yet, the plaintiff admitted in court that it was cognizant that all property tax returns come under a secrecy clause, set out in ORS 308.290(5). The plaintiff itself produced no evidence of a failure of a taxpayer to be protected by the statutory provision. Mr. Smith testified that in his 5% years of service with the Department of Revenue, no unauthorized person had ever asked him for information of the type that plaintiff desired to have kept secret and that he knew of no colleague who had been asked for such information; if he were asked for it, he would not produce it without being ordered by some higher authority. (Tr 49.)
 

 The court recognizes the annoyance to the members of the public which is caused by governmental inquiries, required by the administration of various laws, but can only take note of clearly stated, proved, specific abuses.
 
 *
 

 
 *[328]
 
 Mr. Smith testified as to the basis for his request for additional information from the corporation. ORS 306.126 provides for the department to furnish experienced appraisers from the department’s staff to undertake industrial appraisals upon a county’s request. Under ORS 308.234, the county assessor has a duty physically to appraise each parcel of property in the county at least once every six years, "to insure that equality of taxation according to law shall be secured.” The Department of Revenue’s Industrial Section, acting on behalf of the county assessor, seeks to establish a firm foundation for its valuation in an initial year and then to maintain the probity of its work through a "report method” until a physical appraisal is once again required by statute.
 
 See Astoria Plywood Corp. v. Dept. of Rev.,
 
 6 OTR 40, 43-46 (1975). In order to get the best result contemplated by the statutes, Mr. Smith wished to consider the income approach to value (in addition to the cost approach); he also wished to explore the possibility of functional obsolescence in one cost center in the Albany plant, which had come to his attention particularly. He properly regarded these requests as essential steps in his effort to establish a solid value as of January 1, 1979, as a foundation for appraisals based upon the plaintiff’s written reports over the next five years. (Tr 36.)
 

 The corporation has argued that (1), since the cost approach to value is normally regarded as giving the upper limits of value, and this approach has been used in the present instance, Mr. Smith should be content with the "upper limits of value” and not require the use of the income approach; but (2), if the income approach were used, the mere statement of the taxpayer of its net income, as approved by a certified public accountant, should be sufficient for the apprais
 
 *[329]
 
 er’s purposes; and (3), in effect, that since the discovery of functional obsolescence would diminish the corporation’s tax liability, the taxpayer should have the election to waive such advantage in lieu of revealing its records.
 

 Mr. Smith properly replied that the appraiser should be in a position to form his own judgment, that he was under an obligation and requirement to determine the true cash value per ORS 308.205 and OAR 150-308.205-CA) and (B) (although it is not necessarily a value acceptable to the taxpayer, for one reason or another). Mr. Smith pointed out, in addition, that the term "net income” for accounting purposes, especially with relation to adjustments for depreciation, are rarely equivalent to the "net income” sought for purposes of capitalization under the cost approach.
 

 Plaintiff’s counsel also argued that the question before the court was moot, because the department had actually delivered an appraisal report to the county assessor as to the property here involved, in time for its entry upon the assessment roll for the tax year 1979-1980, and the plaintiff had not contested this appraisal. However, the court reminds the parties that all agreed that this matter should be held open until the Supreme Court made determinations in other, similar cases, above cited, and, further, that under the property statute, amendments to the property tax roll could be made for a period of five years upon proper information of omitted property being brought to the attention of the county assessor. ORS 311.207.
 

 Defendant’s appraisal report was given to the county assessor because of time requirements, although, in the view of the appraiser, it lacked essential information. However, defendant is not foreclosed from doing what it deems to be necessary to obtain a first-class foundation for future years of the appraisal cycle. The county assessor can amend the 1979-1980 assessment
 
 *[330]
 
 and tax rolls, pursuant to ORS 311.211, only if he finds the department’s new data include omitted property, but the department’s assessment for the next open year will be improved and its statutory duty will be more nearly fulfilled.
 

 Counsel for the defendant deplored the present situation, under which bona fide requests to a taxpayer for vital information can be long delayed, under the statutes, by taxpayer resistance and appeal to the courts. This is an old problem. The taxpayer is and should be entitled to all the benefits of due process. Over the years, clear communication to taxpayers of the department’s needs, together with the exercise of a fair, open, consistent and persistent policy of information gathering, with the continued strict observance of the secrecy provision, may well ameliorate the situation. The department, with a history of over 50 years, appears to have pressed the use of subpoenas only during the last one or two years. Taxpayers and department, alike, are seeking accommodation.
 

 The material requested by defendant of the plaintiff, in defendant’s subpoena as above described, is relevant to carrying out the defendant’s duties to the county assessor under ORS 306.126, is not overly broad, and comes within the requirements of
 
 Pope & Talbot, Inc. v. State Tax Com.,
 
 216 Or 605, 340 P2d 960 (1959). Now, therefore,
 

 IT IS ORDERED that plaintiff should be and hereby is required to comply with the defendant’s Order to Produce Records, duly served on Mr. C. W. Knodell, Financial Vice President, Willamette Industries, Inc., on April 4, 1979, except that costs per ton may be evidenced by original invoices, submitted to defendant’s agent for inspection in plaintiff’s office in which they are regularly kept; and
 

 IT IS FURTHER ORDERED that plaintiff shall comply fully with defendant’s Order to Produce Records, as amended hereby, within 30 days from the date
 
 *[331]
 
 of this order, or in such additional time as the court may specifically approve, on motion or stipulation filed in this court prior to the expiration of the allowed 30 days.
 

 *
 

 The court has been unable to find, nor has its attention been called to, a penalty statute, imposed upon a state employee, for breach of the secrecy
 
 *[328]
 
 provision either during or following termination of employment by the state. The enactment of such a statute might aid the department in its requests for records.