HAROLD DOMOGALLA, Assessor
for Marion County, and
DOLORES GLENNIE, Tax Collector
for Marion County

*v.*

DEPARTMENT OF REVENUE

Larry Jon Pound, Marion County Special Counsel, Salem, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered February 10, 1978.

CARLISLE B. ROBERTS, Judge.

Plaintiffs have appealed from defendant's Order No. VL 76-745, dated January 27, 1977. The issue presented is the true cash value as of January 1, 1976, of the improvements on a parcel of real property located in Salem, Oregon, identified as Assessor's Account No. 9794-005. (The parties agree that the land value was $11,000.) As of January 1, 1976, the improvements were placed on the assessment roll at a value of $145,100. Upon appeal to the board of equalization by the taxpayers, Harlan G. Crawford and A. Ora Crawford, this value was reduced to $125,000. Upon the taxpayers' petition to the Department of Revenue, the defendant further reduced this value to $97,850. Plaintiffs, the Marion County Assessor and the Marion County Tax Collector, respectively, appealed the defendant's order, alleging the

true cash value of the improvements was at least $125,000.

As of the assessment date, January 1, 1976, the improvements consisted of two buildings, one of which contained 12,400 square feet and the other, 6,200 square feet. The buildings were constructed in six equal sections with the first section having been completed on May 25, 1972, and the sixth section having been completed on May 12, 1975. Since the assessment date, additional sections, not at issue in this appeal, have been constructed. The buildings are of concrete block construction and have concrete block fire walls at the end of every 100-foot section. The floor is concrete and the section at the south end of each building has a truck loading dock. Electrical service is provided in the form of a minimum number of outlets and a single row of incandescent light fixtures down the center of each building, with the lights about 12 feet apart. None of the sections is heated and there is minimum plumbing provided for some of the tenants. Each 100-foot section has three metal overhead doors and three slab access doors. Thus, each 100-foot section can potentially be divided into three rental units 33⅓ feet wide. When a 100-foot section is divided into more than one rental unit, framed partition walls covered with plywood are used to separate the units. In addition, a 24-foot-wide strip of asphalt runs along the front of both buildings except for a 100-foot section which is paved in concrete. Additional traffic areas are covered with gravel.

Mr. Earl M. Nichols, Commercial Appraisal Supervisor in the Marion County Assessor's office, testified in support of the plaintiffs' valuation of the improvements. Mr. Nichols has been employed by the county for approximately 20 years and is certified as an appraiser by the State of Oregon. He considered the cost, market and income approaches to value in reaching his conclusion that the value of the subject improvements as of January 1, 1976, was $129,000.

For his cost analysis, plaintiffs' witness estimated the replacement cost new of the improvements by using the Department of Revenue's Industrial Appraisal Manual, containing cost factors, as currently revised. He used a construction cost of $7 per square foot to estimate the replacement cost of the buildings to be $130,200. He allowed depreciation of 3 percent, to arrive at a depreciated replacement cost for the buildings of $126,300 (rounded). He estimated the replacement cost of the yard improvements to be $8,100, from which he subtracted depreciation of 5 percent, to arrive at a depreciated replacement cost for the yard improvements of $7,700 (rounded). This indicated a total depreciated replacement cost for the improvements of $134,000.

For his market analysis, the witness used a gross income multiplier and prefaced his analysis with the statement that "[t]here are no known sales of properties directly comparable to the subject. * * *" (Pl Ex 1, at 3.) He did, however, analyze two sales that he felt were somewhat similar to the subject. The first sale was a property located at 1866 13th Street S.E., in Salem, which sold on May 1, 1976, for $32,000. The property had only two rental units and was approximately one-sixth the size of the subject property. After estimating the potential gross income for the property to be $4,620 per year, the witness determined that this sale indicated a gross income multiplier of 6.93.

The witness's second sale was a property located at 2680 Cherry Avenue N.E., again in Salem, which sold on July 29, 1976, for $415,000. This property is a mini-warehouse complex situated on 5.17 acres. The witness determined that 2.72 acres were excess land which could be sold off separately without damaging the mini-warehouse complex. After adjusting the sales price downward to $356,500 (apparently to subtract the value of the excess land), the witness used a gross annual income of $59,328 to determine that this sale indicated a gross income multiplier of 6.

Given this wide range in the multipliers, the witness determined that a gross income multiplier of 6 was the most probable for the subject property. He applied this multiplier to his estimated gross rent for the subject ($23,436) to give an indicated value for the subject property of $140,000. He subtracted the agreed upon land value of $11,000, to arrive at a value for the improvements of $129,000.

The witness began his income analysis by determining an indicated economic rent for the subject property by evaluating the rental schedules from three rental properties in Salem which he felt were comparable to the subject property. From these three comparables, the witness derived an economic rent for the subject property of 10½ cents per square foot per month, for an annual economic rent of $23,436. He reduced this figure by 6 percent to allow for potential vacancies and subtracted estimated expenses totaling $4,640, for an annual net income of $17,390 for the subject property.

The witness determined that the appropriate capitalization rate for the subject property would be 10 percent. He derived this rate almost exclusively from the two sales used in his gross-income-multiplier analysis. He stated that he felt that the expense ratios for the two sales would be approximately the same as the expense ratio for the subject. He stated that Sale No. 1 indicated a capitalization rate of 9.4 percent and that Sale No. 2 indicated a capitalization rate of 10.3 percent. He felt 10 percent was the appropriate rate for the subject property and added to that rate an additional 2.4 percent to account for the property tax rate, as is customary when appraising property for property tax purposes. Capitalizing the $17,390 annual net income at 12.4 percent gave an indicated value of $140,000 (rounded). He subtracted the land value of $11,000, to arrive at a January 1, 1976, value for the improvements of $129,000. In his final correlation of the value indications derived from the three approaches, the witness stated that he believed the cost

approach to be the least reliable and he gave little weight to that approach. He felt the income approach to be the most reliable estimate of market value for the subject and placed his greatest reliance upon that indication and used the market comparison only to support the income approach.

Defendant offered the testimony of the taxpayers, Mr. and Mrs. Crawford, in support of its valuation of the improvements on the subject property. Mr. Crawford, a building contractor, served as general contractor in the construction of the improvements on the subject property. Mrs. Crawford is the bookkeeper for her husband's construction business.

Mrs. Crawford testified that the taxpayers' construction costs for the improvements on the subject property as they existed on January 1, 1976, were $97,885.25. This figure represented the total cost to the taxpayers of the improvements on the subject property, including architect's fees and Mr. Crawford's labor, profit, and overhead. The figure makes no allowance for depreciation. Mrs. Crawford testified that these records were maintained to enable Mr. Crawford to prepare bids on other construction projects. She further stated that two more sections, identical to the first six sections, were completed in 1976, for a total cost of less than $30,000. She felt that this indicated that the replacement cost of the subject improvements as of January 1, 1976, had not increased over the actual cost of the improvements. Mr. Crawford testified that his opinion of the market value of the subject improvements as of January 1, 1976, was $97,885.25.

■■ ORS 305.427 places the burden of proof in this case upon the plaintiffs, who must prove their case by a preponderance of the evidence. An analysis of the appraisal presented by plaintiffs' witness leaves the court unpersuaded. The appraisal is incomplete, inadequate and superficial. The witness's testimony and his written appraisal report are marked by a lack

of supporting evidence and detail. Mr. Nichols was dependent in large measure on the work of another appraiser (who was not present in court) and he was not able to answer questions on the work of the other appraiser. (Note the court's comments in *Astoria Plywood Corp. v. Dept. of Rev.,* 6 OTR 40 (1975).)

The two sales from which the witness derived his gross income multiplier did not, in the court's opinion, involve properties sufficiently comparable to the subject property. Sale No. 1 was significantly smaller than the subject property and Sale No. 2 was significantly larger than the subject property. Neither of the sales was located in the same area as the subject property and Sale No. 1 had a different zoning, but the witness made no attempt to show that the land values were comparable. The witness adjusted Sale No. 2 to compensate for what he considered to be 2.72 acres of excess land included in the sale without ever explaining how he valued that excess land. The witness never stated how he determined what the gross income was for either of the two sale properties and in cross-examination admitted that he did not have the actual income and expense figures for either of them.

■ The *Encyclopedia of Real Estate Appraising* 44-45 (Friedman ed, rev & enlarged ed 1968), with reference to gross multipliers, states that seven or eight rented properties comparable to the one under appraisement must be selected and the rental values determined. Then, seven or eight properties comparable to the one under appraisement which have been sold on the market must be ascertained and a fair rent assigned to each by comparison with rented properties. The gross income multiplier equals the sales price divided by the annual income. Plaintiffs' witness attempted to apply the gross income multiplier on the basis of the sale of only two properties, neither of which was comparable to the subject property. Accordingly, the court can place little confidence in the gross income multiplier selected by the witness or the value indication derived from it.

The witness's estimate of value based upon the income approach is fraught with the same weaknesses. He used a market capitalization rate derived from the same two sales used to develop his gross income multiplier. These sales are no more comparable when used to develop a capitalization rate than when used to develop a gross income multiplier. Further, the witness never explained how he derived the capitalization rates from the two sales. Notably absent from his testimony and his appraisal report is any mention of the amount of net income used to compute the capitalization rate indicated by either of the sales. He admitted in cross-examination that he did not have the actual income and expense figures for either of the two sale properties. Apparently he chose, instead, to use an economic rent for each of the sale properties and then subtracted an amount for expenses which he felt was typical for the market without giving any supporting data to justify his income and expense computation.

■■ In a discussion of capitalization rates, the American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (6th ed, rev 1977), states, at 347:

"Capitalization is a process which translates an income projection into an indication of value. The connecting link is a rate which reflects the return necessary to attract investment capital. Hence the selection of an appropriate rate represents a critical factor in the capitalization process."

When attempting to derive a capitalization rate from market data, it is necessary that the appraiser ascertain "the sales price of several properties similar to the property being appraised, and the income from such properties. He then computes the ratio of income to sales price, and such ratio indicates the capitalization rate on each piece of property. * * * As many sales as possible should be considered, for no one particular sale can be the exact criterion of the trend or condition of the market." (*Encyclopedia of Real Estate Appraising, supra,* 41-42.) Plaintiffs' witness attempted to

derive his capitalization rate from the sale of two essentially noncomparable properties, using an undisclosed figure for net income from each of the properties, which the court has no means of evaluating.

■ The witness concluded that the indication of value obtained by applying this capitalization rate to his estimate of the net income for the subject property (also calculated without knowledge of the actual income and expenses) was the strongest indication of the value of the subject property. The court cannot agree. The court can only be persuaded by those conclusions of value which appear to be well supported and reasoned. This witness failed to provide substantial supporting data and significant steps in his reasoning were left unexplained. Much information which was provided was derived from unacceptable sources.

This only leaves each side's estimate of value based upon the cost approach. Plaintiffs' witness placed little confidence in his cost approach analysis. It was based upon an estimated cost of construction as of January 1, 1976, of $7 per square foot. He derived this figure from the defendant's industrial cost factor book without ever disclosing what, if any, adjustments were required to obtain the appropriate cost of construction in the Salem market on January 1, 1976. On cross-examination, the witness stated that the defendant's cost factor book is based on Portland building costs and that he was unaware of the adjustment required to relate those costs to the costs in the Salem area. The witness's estimate of $7 per square foot is unable to bear the light shone by Mr. and Mrs. Crawford's testimony that identical improvements completed in 1976 cost less than $5 per square foot and identical improvements completed in 1977 cost only $5.16 per square foot.

■ There is always apprehension that the well-kept records of cost for a particular structure do not represent the market. Properly used, the defendant's cost factor book, utilizing scores of transactions,

should be more reliable. The testimony in the present instance may be exceptionable because the taxpayers' records were maintained by a highly knowledgeable individual for the purpose (among others) of enabling a building contractor to make competitive bids on other projects. The testimony showed that all factors were considered, such as the entrepreneur's management costs, architect's fees, adjustments for time, depreciation, and the like (with a well-supported determination that depreciation was offset by inflation in this instance).

The plaintiffs have failed to sustain their burden of proof. The preponderance of the evidence supports the defendant's true cash value for the subject property as of January 1, 1976.

Defendant's Order No. VL 76-745 is affirmed.

Since the parties are governmental agencies, each shall bear its own costs.