CARLISLE B. ROBERTS, Judge.
 

 The plaintiff partnership appealed from defendant’s Order No. VL 78-380, dated August 1,1978. The issue presented was the true cash value on January 1, 1977, of 5,000-plus acres of Crook County farmland, identified in the assessor’s records as Tax Lots 17 19-TL 800-1,17 19-TL 1000-1, 16 19-TL 2000-1, 16 19-TL 2100-1 and 16 19-TL 2300-1. The parties agreed that the highest and best use of the farmland was as a cow/calf grazing operation. The subject property has been granted the special farm use classification under ORS 308.370.
 

 It was agreed by the parties that the market data approach was impracticable because of a lack of comparable sales; therefore, its tax valuation must be determined pursuant to ORS 308.345(3):
 

 "When comparable sales figures cannot be utilized in arriving at assessed values of agricultural lands as provided in subsection (2) of this section by reason of insufficient sales meeting the criteria set forth in subsection (2) of this section, the assessed values of agricultural lands shall be arrived at by utilizing an income approach. In utilizing the income approach, the capitalization rate shall be the effective rate of interest charged in Oregon by the Federal Land Bank at the time of closing on loans for farm properties estimated as an average over the immediate past five years, plus a component for the local tax rate. The Department of Revenue annually shall determine and specify such rate according to the best information available, and shall certify such rate to the county assessors.”
 

 Pursuant to the statute, the Department of Revenue had determined the rate of capitalization for farm use properties as of January 1, 1977, was .096 (including adjustment for local taxes). Consequently, the primary issue to be resolved is that of net income. To
 
 *[334]
 
 use the income approach to value, productive capacity must be converted into animal-unit-month (AUM) rental values, the appropriate expenses subtracted therefrom, and the net income thus obtained must be capitalized by use of the agreed .096 divisor.
 

 Mr. Tom Wolverton, a long-time employee and former manager of the subject property, testifying for the plaintiff, stated that production varied greatly on different parts of the subject property. He alleged that irrigated hay land averaged 2% tons of alfalfa per acre and that this production translated into four AUMs per acre. Mr. Wolverton estimated that the crested wheat acreage production would support only one-fourth AUM per acre, and that the dry pasture (constituting the greater part of the land) would contribute only one-tenth AUM per acre. Mr. Wolverton defined an AUM as a cow plus calf under nine months old.
 

 Testimony given by Mr. Wolverton indicated that cows on the subject property weighed 750 to 800 pounds. He also testified that the usual practice in the area was to sell calves in the fall but it was the practice of the plaintiff to hold its calves until January or February before selling; therefore, these calves were fed until they were nine to 11 months old. Despite his testimony defining an AUM as a cow/calf pair
 
 if
 
 the calf was
 
 under
 
 nine months old, Mr. Wol-verton contended that the cow/calf pairs on the subject property, with older calves, were to be considered as one AUM, nevertheless.
 

 Mr. H. Kent Rothrock, a professional appraiser with 18 years of experience, appeared as an expert witness for the plaintiff. He is familiar with the subject property and the area and with eastern Oregon. (His home is in Umatilla County and he operates a ranch of his own in Union County.)
 

 Mr. Rothrock testified that he considered an AUM to be a cow plus a calf under six months old. (This conclusion was not supported by data.) He assigned
 
 *[335]
 
 five land classes to the subject property and alleged that (1) irrigated hay land would produce enough feed for 4.8 AUMs per acre; (2) irrigated meadow or pasture and its aftermath, 2.7 AUMs; (3) creek bottom pasture, 2 AUMs; (4) crested wheat, .25 AUM; and (5) range, .10 AUM per acre. Using this classification for each of the five tax lots in dispute, the plaintiff’s witness concluded that the subject property would produce a total of 2,794 AUMs. At a rental of $6 per AUM, total gross income wuld be $16,764. Expenses must be subtracted to arrive at net income, and Mr. Rothrock listed expenses common to each tax lot as management, 5 percent of gross, maintenance at 3 percent of gross, legal and accounting fees at 2 percent of gross income, and insurance of 15 cents per acre. In addition, particular expenses were ascribed to certain areas such as fertilizer, reseeding expenses for irrigated hay land and for crested wheat acreage, spray for crested wheat acreage, operation and maintenance fees for fences and for irrigation ditches, and expenses for the control of sage rats and for juniper. (PI Ex 4.)
 

 Mr. Rothrock estimated that total expenses equaled $8,422; therefore, net rental income for the subject property for the tax year 1977-1978 was $8,342. The plaintiff’s witness concluded that the capitalization rate set by the Department of Revenue pursuant to ORS 308.345(3) of .096 (8.2 percent interest rate, plus 1.4 percent tax rate) divided by the net income, resulted in a true cash value for the subject property of $86,895.83 on January 1, 1977.
 

 Mr. Tom Green, the chief appraiser in the Crook County assessor’s office, testified for the defendant. As part of his official duties, Mr. Green had appraised almost all of upper Crook County and had classified the land on the basis of its productivity. This classification was used to determine value for tax purposes. The defendant’s witness testified that in 1975 the plaintiff’s property was subject to the six-year reappraisal cycle as dictated by ORS 308.234, "to
 
 *[336]
 
 insure that equality of taxation according to law shall be secured.” At that time the land was inventoried and grouped into different levels of production: irrigated hay land or pasture, seeded dry pasture or creek bottoms, and dry range land pasture.
 

 In order to estimate the number of animal unit months (AUMs) of grazing that the subject property should produce, Mr. Green testified that he sought production information from similar land in comparable areas. His testimony indicated that he relied heavily on the production figures given him for the Wayland Ranch (near the subject property) as to the value of the irrigated hay lands and meadows. Mr. Green testified that the Wayland Ranch produced 1.9 tons per acre. Using 800 pounds of dry matter as the equivalent of one AUM, Mr. Green translated that yield into approximately 4.8 AUMs per acre, plus one AUM of aftermath grazing, or a total of 5.8 AUMs per acre for the irrigated hay land or pasture. The defendant’s appraiser estimated that the second land classification ascribed to the subject property, that of seeded dry land pastures and creek bottoms, would require two acres to provide one AUM of grazing.
 

 Mr. Green acknowledged that dry range land classification varies in its production. He offered three comparable leases to support his production estimate. Lease No. 1 indicated five acres to provide one AUM. Leases 2 and 3 are allegedly more typical of the average range in the area and comparable to two-thirds of the subject property range. These leases indicate 10 to 14 acres to provide one AUM of feed; therefore, Mr. Green concluded that it would require ten acres of the subject property’s range to produce one AUM of feed.
 

 The defendant’s expert witness contended that the subject property should produce a total of 4,189.5 AUMs as opposed to the plaintiff’s expert witness’s contention that total production should be 2,794 AUMs. Part of this discrepancy is due to the different land classifications used by the parties and part is due
 
 *[337]
 
 to a difference in definitions of an AUM. As stated above, the plaintiff’s witness defines an AUM as a cow and a calf up to six months of age, while the defendant’s witness asserts that a cow is one AUM and .35 AUM must be added for a calf. Mr. Green contends that 1.35 AUM is required for a cow and a calf even before the calf is weaned because the cow is eating more heavily than normal during this period.
 
 [1]
 

 Another area of disagreement concerned allowable expenses to arrive at net income. The plaintiff’s indicated expenses on the five tax lots ran from 40 to 90 percent of gross income. (PI Ex 4.) The defendant presented five 1976 leases indicating expenses from 10 to 29 percent of gross income. Mr. Green testified that the total of plaintiff’s claimed expenses was unusually high in Crook County.
 

 Based upon alleged production of comparable properties, utilizing a land classification system set by the county and considering a cow/calf unit as 1.35 AUM, the defendant’s witness concluded that the true cash value of the subject property on January 1, 1977, was $232,180.
 
 [2]
 
 (Def Ex A, 15.)
 

 The court notes that at the Department of Revenue’s hearing on July 26, 1977, the true cash value of the subject property, as equalized by the county board, was $202,150 and that the value pleaded by the petitioner was $101,754, resulting in a ratio of approximately two to one. Two and one-half years later, when the same issues were presented to this court, the valuation ratio was almost three to one, with the
 
 *[338]
 
 defendant asserting a true cash value of $232,180 versus the plaintiff’s alleged value of $86,896.
 

 Mr. Rothrock offered little or no supporting data to show the court how he arrived at either his definition of AUMs, his five land classifications or the resulting production figures. As this court stated in
 
 Astoria Plywood Corp. v. Dept. of Rev.,
 
 6 OTR 40, 51 (1975):
 

 "* * * An expert witness is expected to give a satisfactory explanation of the methods by which
 
 he
 
 arrived at his opinion and the basis for any formula used by him.
 

 When questioned as to why he didn’t use actual production figures sworn to by Mr. Wolverton, the plaintiff’s witness testified that he was estimating typical production, not actual. However, the comparable leases included in Plaintiff’s Exhibit 4 were apparently offered by the witness to support his rental estimate of $6 per AUM, with little reference or documentation concerning production. One of the three comparables offered by the witness was a lease from the owner to a cousin and a second lease was to a brother, raising the question whether the transactions were at "arm’s length.”
 

 The defendant’s expert witness offered a production analysis chart of comparable properties based on the county’s classification system. With the use of these land production comparables, the witness supported his estimate of the subject property’s production and translated production into AUMs based on 1.35 AUMs for a cow/calf unit. As stated above, the witness concluded that the subject property’s production equalled 4,189.5 AUMs as contrasted to the plaintiff’s estimate of 2,794 AUMs.
 

 The variance in estimates of total AUMs was influenced by differences in production estimates and by different definitions of an AUM. The defendant presented data in Defendant’s Exhibit A, 20, pertaining to the definition of an AUM; for example:
 

 
 *[339]
 
 Stoddart and Smith, 1955,
 
 Range Management,
 
 McGraw-Hill, New York, page 2, writes that an animal unit is considered 1,000 pounds live weight, or roughly equivalent to the weight of a cow and a calf. Ensminger, 1970,
 
 The Stockman s Handbook,
 
 The Interstate Printers and Publishers, Danville, Illinois, page 934, lists a cow as one AUM and a calf as .25 AUM. On page 23 of Defendant’s Exhibit A, data are presented concerning current usage of AUMs by governmental agencies, showing that the U. S. Forest Service uses 1,000 pounds/AUM for a cow and a calf or 750 pounds for a cow with no calf. The Soil Conservation Service uses 1,000 pounds/AUM and the Bureau of Land Management uses 750 to 800 pounds/AUM.
 

 The court has not received data from the witnesses respecting the definition of AUM to the extent necessary to establish a conviction in favor of the specific meaning. Fortunately, on consideration of the total testimony, this failure does not prevent disposition of the case.
 

 Turning to the subject of allowable expenses, the defendant’s witness, Mr. Green, offered six leases as comparables in his appraisal of the subject property and the allowable expenses were noted for each lease. The plaintiff and the defendant agreed that a reasonable management expense was five percent of gross income.
 
 [3]
 
 After this initial agreement on management expense, the two experts varied widely in their expense estimates. Mr. Green presented expenses for each of six comparable leases (Def Ex A, 4-6), listing insurance charges, fence maintenance, irrigation labor and water charges, in addition to the five percent management fee. These data indicated expenses for the comparable leases running from 10 to 29 percent of gross income.
 

 
 *[340]
 
 Mr. Rothrock presented the following expense information and applied it to each of the subject tax lots with the result that the plaintiff’s estimated expenses were from 40 to 90 percent of gross income:
 

 " 1. Mgt. 5% of Gross Income.
 

 " 2. Maintenance 3% of Gross Income.
 

 " 3. Fence — $800/mi — 20 year life = $40/mi/yr.
 

 " 4. Insurance $.15/ac for liability.
 

 " 5. Fert. 300#/YR x $120/T = $18/ac.
 

 " 6. Reseed Alfalfa or In. Past. — materials 15# c $1/# = $15/ac.
 

 " 7. Reseed Cr. Wheat — Cost $3/ac. & gov’t will pay for 50% of cost.
 

 " 8. Spray Cr. Wheat — $4.50 in actual cost/acre. & gov’t pays 50%.
 

 " 9. O & M always runs about $.50/ac irrigated.
 

 "10. Legal & Acc. Fees — on a ave run 2%.
 

 "11. Sage Rat Control — all irrigated hayland. $105/300# of min. or $.35/# x 5#/ac. used/ac. or $1.75/ac.
 

 "12. Juniper Control — ave cost has been $25/ac. & gov’t pays 50% of cost.”
 

 Mr. Rothrock impressed the court as a person of probity who had had ample experience in operation of and opportunity to observe conditions which pertain to the economics of real property such as the subject. However, his testimony was chiefly composed of conclusions. In particular, he offered little or no data to justify his expense computations. As this court held in
 
 Domogalla et al v. Dept. of Rev.,
 
 7 OTR 340 (1978), a convincing appraisal requires supporting evidence, with a presentation of the significant details which led to the conclusions reached by the expert witness.
 

 Even an unprepared witness, who has some of the propensities of an actor, can testify in an authoritative manner, but conviction is imparted by laying a foundation of scholarly research which points the way to the conclusion. As stated by the court in
 
 Chicago and
 
 
 *[341]
 

 North Western Railway Co. v. Hillard,
 
 502 P2d 189, 192 (Wyo S Ct 1972):
 

 "* * * a rather general statement of the rule is that the record must show sufficient facts upon which the judgment and opinion of the expert were based. A witness who asserts an opinion of the value of property not supported by facts is not competent, and an expert’s opinion is not
 
 substantial evidence
 
 unless he can give a satisfactory explanation of how he arrived at his opinion. The expert, if relying upon a formula, should state his reasons for its adoption and its component factors and assumptions. The opinion of the expert cannot be inferred from the conclusion nor is it proof of existence of factors necessary to support it. * * *”
 

 In all proceedings before the Tax Court, the burden of proof falls upon the party seeking affirmative relief. ORS 305.427. The court holds that the plaintiff has failed to sustain the burden of proof. The court finds that the preponderance of the evidence supports a true cash value for the subject property, as of January 1, 1977, of $232,180. Defendant’s counsel shall prepare a form of decree, pursuant to Tax Court Rule No. 27, in accordance with this opinion.
 

 The defendant is awarded its statutory costs.
 

 [1]
 

 In the case of
 
 Cliff v. Dept. of Rev.,
 
 8 OTR 250 (1980), the court found the preponderance of the total evidence favored the plaintiff. In that case the parties’ respective definitions of an AUM were the same as in this case. In both cases, the formula used was not a decisive factor.
 

 [2]
 

 Mr. Green stated that total farm use value on January 1, 1977, was $244,930, but this total included Tax Lot 1100, valued at $12,750. This tax lot is not included in the subject property at issue.
 

 [3]
 

 The defendant listed the management fee as one percent in lease number two, with the other five leases allotted a five percent management fee.