IN THE OREGON TAX COURT

J. R. SIMPLOT COMPANY
*v.*
DEPARTMENT OF REVENUE
LAMB-WESTON, INC.,
*Intervenor*
(TC 2885)

UMATILLA COUNTY
*v.*
DEPARTMENT OF REVENUE
LAMB-WESTON, INC.,
*Intervenor*
J. R. SIMPLOT COMPANY,
*Intervenor*
(TC 2962)

Steven H. Corey and Timothy O'Rourke, Corey, Byler, Rew, Lorenzen & Hojem, Pendleton, represented plaintiff/intervenor J. R. Simplot Co.

Marilyn J. Harbur and James C. Wallace, Assistant Attorneys General, Department of Justice, Salem, represented defendant.

Richard A. Hayden, Bogle & Gates, Portland, represented Lamb-Weston, Inc., intervenor.

No appearance by plaintiff Umatilla County.

Decision for defendant rendered March 19, 1993.

**CARL N. BYERS, Judge.**

These suits concern the value of Simplot's potato processing facility near Hermiston for 1984, 1985 and 1986. In 1984, Simplot appealed its assessed value to the board of equalization. The board ordered the value reduced to $36,056,150. The assessor appealed that order to defendant. After a hearing, defendant increased the value to $39,132,160, and Simplot appealed to this court.

On January 19, 1990, this court ordered defendant to hold a hearing on the merits concerning 1985 and 1986. *J. R. Simplot Co. v. Dept. of Rev.*, 11 OTR 309 (1989). After holding a hearing as ordered, defendant reduced the value to $20,700,000 for 1985 and to $20,600,000 for 1986. The assessor then appealed to this court. The cases have been consolidated for trial.

The property is a large, integrated facility which processes raw potatoes into frozen french fries and preformed potato products, such as hash browns. Virtually all of the production is sold to a leading international fast food chain. The facilities include the buildings and equipment necessary to receive, store, clean and sort potatoes, which are then

peeled, trimmed, cut, graded, sorted, blanched, fried, defatted, frozen, inspected, packed and shipped. There is also an office, cafeteria, state inspection building, maintenance building and laboratory. The plant contains approximately 331,370 square feet of gross floor area.

## STATUTORY ELECTION

Simplot elected to have the plant valued under ORS 308.411.[1] That statute raises significant problems of application and merits discussion at length.

Except as provided by subsections (2) through (9), ORS 308.411(1) requires industrial plants to be valued at true cash value using the three traditional approaches to value. Subsection (2) states:

> "The owner of a plant may elect to have the plant appraised and valued for ad valorem tax purposes excluding the income approach to valuation and *excluding taking into consideration functional and economic obsolescence in the utilization of any approach to valuation.*" (Emphasis added.)

Subsection (3) provides the manner by which an election is made. If the owner does not make the election, subsection (4) requires the owner to furnish income and expense information to the department to enable it to determine the true cash value of the plant. If an owner makes the election, subsection (5) prohibits the owner from introducing evidence relating to the use of the income approach or the allowance of obsolescence. If an owner wants to rescind the election for a following year, subsection (6) requires the owner to "demonstrate" the need for the income approach or the allowance of functional and economic obsolescence to arrive at true cash value. Subsection (7) permits the owner to request a conference after a plant has been appraised and subsection (8) excuses an electing owner from furnishing any income or expense information. Subsection (9) states in part:

> "In no event shall the application of subsection (2) of this section operate to value an industrial plant below its true cash value for ad valorem tax purposes * * *."

The terms "functional obsolescence" and "economic obsolescence" are not defined by statute or defendant's

---

[1] All references to ORS 308.411 are to the 1983 Replacement Part.

administrative rules. The common meaning of functional obsolescence is depreciation or loss in value due to changes in technology or design, improved processes, materials, and other such improvements. *See* Appraisal Institute, *The Appraisal of Real Estate*, 352-58 (10th ed 1992). Economic obsolescence or external obsolescence is loss in value due to forces from outside the property, such as neighborhood decline, market or industry changes and general economic conditions. *Id.* at 358-59.

■     In summary, ORS 308.411(2) enables a plant owner to keep income and expense information confidential and out of the hands of the taxing authorities. However, this advantage is obtained at a price: the assessed value of the plant will likely exceed its true cash value.[2] In fact, it is misleading to think in terms of true cash value. It is more accurate to think in terms of the "elected" value.

## LEGISLATIVE HISTORY

ORS 308.411 arose out of the concern of industrial plant owners that confidential income and expense information obtained under defendant's subpoenas would become known to competitors. Industry proposed legislation to protect plant owners from such forced disclosure. *Hearing on HB 2928 before the 1981 House Revenue Committee* (Tape 101, Side A) (statements of Rep Markham and Sen Kitzhaber). At the legislative hearings, the department presented its need for such information. *Id.* (Tape 102, Side B) (statement of Robyn Godwin). After prodding by the legislature, industry and department representatives worked out a compromise which became ORS 308.411. *See* Or Laws 1981, ch 139, § 2.

The compromise recognized the three traditional appraisal approaches to valuing property: the cost approach, the sales comparison or market approach and the income approach. The participants were aware that income and expense information is used in all three approaches to varying degrees.[3] Nevertheless, it appears the legislature intended to

---

[2] By making an ORS 308.411 election, a party makes an "*irrevocable waiver* of any subsequent claim that the failure of the assessor or the department to consider the income approach or functional or economic obsolescence resulted in a valuation in *excess of true cash value * * *.*" ORS 308.411(9) (emphasis added).

[3] Robyn Godwin, then director of the Department of Revenue, in his testimony,

exclude only the income approach entirely. The cost approach and the sales comparison approach were to be used, but without considering obsolescence. It was made clear this could result in an assessed value greater than true cash value.[4]

## STATUTORY CONSTRUCTION

The court's primary duty is to ascertain the intent of the legislature. *Whipple v. Howser*, 291 Or 475, 632 P2d 782 (1981). Although this is done by focusing on the words used in the statute, words do not always reflect legislative intent. In the most difficult cases, a court may even have to modify the meaning of sentences in order to reconcile legislative intent with the realities present. *Holman Tfr. Co. et al v. Portland et al*, 196 Or 551, 565, 249 P2d 175, 250 P2d 929 (1952).

The statutory language used in ORS 308.411(2) is very broad. ''Excluding'' consideration of obsolescence undercuts the very foundation on which all appraisal approaches rest: the principal of substitution.

> *"The principal of substitution states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price attracts the greatest demand and widest distribution."* Appraisal Institute, *The Appraisal of Real Estate* 39 (10th ed 1992) (emphasis in original).

Excluding ''consideration'' of obsolescence, means it cannot be weighed or taken into account in forming an opinion of value. This is what the owner ''elects.'' Thus, the election is to have the property assessed at a value which is something other than true cash value or market value. Subparagraph (5) directs that no ''allowance'' be made for obsolescence. This wording might imply that only specific deductions are prohibited. However, such an interpretation

---

pointed out that income and expense information is used in all three approaches. *See Hearings on HB 2928 before the 1981 House Revenue Committee* (Tape 102, Side B).

[4] In one of the legislative hearings, a committee member explained why the plant owner had to be careful in making the election.

"And he can't complain thereafter that his election resulted in something in excess of true cash value. We have to remember that it is the industry that is asking for this bill * * *." *Hearings on HB 2928 before the 1981 House Revenue Committee* (Tape 165, Side A) (Statement of Rep Schoon).

would be inconsistent with the election made by the owner in subsection (2). To value a plant without "consideration" of obsolescence means that obsolescence will not be considered, whether specifically deducted or not.

When seeking true cash value or market value, an appraiser must consider not only obsolescence and physical depreciation, but also their combined effect.

> "Even when depreciation is measured simply by a comparison between the *future retirement dates of the old asset* and of the hypothetical substitute asset, as under the straight-line method, the appraiser must usually consider the *combined* effect of wear and tear and obsolescence in forecasting when the retirement will be made." I Bonbright, *Valuation of Property* 197 (1937) (emphasis in original).

Although the legislature may not have intended the sales comparison approach to be excluded from use, it apparently did not understand that approach. In using that approach on industrial plants, an appraiser *must* consider obsolescence in order to determine if the plants are comparable. A hypothetical example will illustrate this point. Assume the subject property is an old plant with a $60,000,000 reproduction cost new; the "comparable" sale is a newer plant which sold for $55,000,000 but has a reproduction cost new of only $50,000,000. Also assume that both plants have the same capacity and actually produce the same number of pounds of product. Given these facts, there is no way of knowing whether the subject property is worth more or less than the comparable sale plant without considering obsolescence.

## THE COST APPROACHES

Simplot's evidence included three separate cost approaches, one by Consilium, one by Mr. Slack and one by American Appraisal Company. Mr. Ulrich, a Consilium appraiser with extensive experience in appraising potato processing plants, testified for Simplot. He reviewed the subject property in 1984 and appraised it for January 1, 1987. Mr. Ulrich did a full inventory for the 1987 appraisal. This was adjusted back, based on additions and deletions reported and discussions with plant personnel, to reflect the property as it existed on January 1, 1985, and January 1, 1986. Mr. Ulrich

viewed the plant as "basically state-of-the-art" with no significant elements of obsolescence.

■         However, Consilium's allowances for depreciation included elements of functional and economic obsolescence. Mr. Ulrich testified that the buildings and structures were depreciated "based upon the effective age of the building and its normal economic life." Machinery and equipment was depreciated "for the condition and utility of the subject units." These kinds of measures are intended to arrive at true cash value. Here, it must be remembered, the goal is not market value. The goal is a value higher than market value because the market considers functional and economic obsolescence. The court cannot consider Consilium's mixed approach to depreciation because it cannot evaluate that kind of evidence without considering obsolescence. Therefore, no weight can be given to the value indicated by Consilium's cost approach.

Based on asset listings furnished to him by Consilium and additional information, Mr. Slack appraised the plant using a reproduction cost approach. His estimate of reproduction cost new appears low, due in part to inadequate estimates for installation or assemblage costs. Also, many of his estimates lack the specificity which aids in persuasion. For example, his listing of the frozen french fry grading system in a freezing tunnel runs seven pages in length but shows only a single estimated depreciated value. Although Mr. Slack testified that he applied only physical depreciation, the court finds otherwise. His testimony described extensive functional obsolescence. Mr. Slack described the facility as the "biggest research and development laboratories that makes money that I've ever been through." He described many changes made to the plant, the great majority of them for reasons of functional or economic obsolescence. The court finds that the preponderance of the evidence shows that the majority of the replacements and changes in the subject property have been due primarily to technological or functional necessity, not physical wear and tear.

Simplot also offered the testimony of Mr. Watson of the American Appraisal Company who performed a reproduction cost new approach for 1987. This is not one of the years at issue and the evidence was offered only to show that how few

technological changes took place over time. Although Mr. Watson also purported to deduct only for physical depreciation, his opinion focused on market value. He stated "what we're searching for here is market value." To arrive at market value, he applied depreciation "predominantly" on an age-life basis, looking at the "normal" life of equipment. He admitted that his depreciation estimates for the buildings had some elements of obsolescence in them.

Ms. Daniell testified for defendant. She used a trended investment cost method (TICM). This method utilizes the property owner's cost records. These historical costs are trended to bring them up-to-date for the year in question and then reduced for depreciation. Her total trended historical costs gave a reproduction cost new which was then depreciated based on estimated lives. In estimating depreciation, machinery and equipment were broken into two separate groups, one having an estimated life of 12 years and the other having a life of 20 years. Buildings and structures were depreciated on a straight-line basis using a 40-year life. If equipment was still being used, it was not depreciated below 20 percent.

Simplot challenged the accuracy of this appraisal because there were no actual invoices or records of capital improvement projects for property constructed or purchased prior to 1981. This included 90 percent of the buildings and 83 percent of the machinery and equipment. For this information, Ms. Daniell relied upon Simplot's asset listing, which she testified would be more accurate than for later years when Simplot was making piecemeal changes. Ms. Daniell testified that Simplot never corrected its asset listing or indicated it was inaccurate. Ms. Daniell's approach resulted in an indicated value of $46,000,000 for 1984 and $43,000,000 for 1985 and 1986.

■ The court finds that Simplot's estimates of reproduction cost new are less reliable than defendant's estimates. Consilium's cost approach was based on the work of Messrs. Margreiter and Lessard. Although they were supervised by Mr. Ulrich, neither testified to explain their work. Both Mr. Ulrich and Mr. Tapanen were unable to answer a number of questions or explain what was done, leaving the court with uncertainty about the assumptions and the work involved.

Where the appraiser testifying is not the one that prepared the work or the exhibit, he or she must be thoroughly familiar with the underlying assumptions or the court can give the testimony little weight. *See Astoria Plywood Corp. v. Dept. of Rev.*, 6 OTR 40, 50 (1975).

Mr. Slack likewise relied on Consilium's equipment listing and the used equipment market. His estimates of depreciation also included functional and economic obsolescence. Depreciation based on "normal lives" or other such measure requires the court to consider economic and functional obsolescence. The statute prohibits this. Likewise, the court finds that the used equipment market is largely irrelevant in this case.

One perspective is to consider the reproduction cost new without depreciation of any kind. There is some evidence that a reproduction cost new of 15 cents per pound of capacity might be reasonable. This would result in a reproduction cost new for the subject plant of approximately $46,000,000 to $48,000,000. Since all of the parties agree that the subject is a state-of-the-art plant suffering essentially no economic or functional obsolescence, the only deduction from this reproduction cost would be physical depreciation. Neither side produced evidence of pure physical depreciation.[5] Due to the nature of the approaches and the evidence adduced, this is not a case where the court finds it can adjust the values found by the appraisers. Accordingly, the court accepts defendant's $46,000,000 for 1984 and $43,000,000 for 1985 and 1986 as the most reliable estimate of the ORS 308.411 value of the subject property by the cost approach.

## SALES COMPARISON APPROACH

As indicated above, the sales comparison approach can be given little, if any, weight. Mr. Gamache testified for Simplot that the subject plant would have a reproduction cost new equal to 15 cents per pound of production. Mr. Gamache used 6.8 cents per pound of production. This indicates physical depreciation of 55 percent. The court cannot accept that a

---

[5] Defendant's appraiser, Ms. Daniell, erroneously believed defendant was entitled to "consider obsolescence from all sources" and stated, "I believe that the depreciation lives that we have assigned include some functional obsolescence * * *."

state-of-the-art plant of the subject's age suffered 55 percent physical depreciation.

Mr. Brown, who testified for Simplot, used 6.5 cents per pound of production capacity as an indication of market value. His testimony has many of the same problems as Mr. Gamache. Neither of these witnesses could testify as to how the plants compared in terms of their operating expenses, maintenance costs or other critical data. Without such data, the court is unable to determine if the sales are even comparable. Mr. Brown admitted that all units of comparison were weak. He was not aware of $6,000,000 of functional obsolescence in the Boardman sale and admitted that McCain Foods and Grand Forks sales contained functional obsolescence.

Mr. Blomberg testified as to the sales comparison approach for the defendant. Mr. Blomberg's testimony was subject to most of the same weaknesses as Simplot's witnesses. His testimony had additional weaknesses, such as relying upon actual production, regardless of the kind of assets involved. For the years at issue, the defendant placed no weight on the sales comparison approach.

The court finds defendant's cost approach produced the most reliable evidence of value. Accordingly, the court finds that the assessed value, established in accordance with ORS 308.411, is $46,000,000 for 1984 and $43,000,000 for 1985 and 1986. Costs to defendant.

## ON MOTION
## FOR RECONSIDERATION

Steven H. Corey, Corey, Byler, Rew, Lorenzen & Hojem, Pendleton, represented plaintiff/intervenor J. R. Simplot Co.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Richard A. Hayden, Bogle & Gates, Portland, represented Lamb-Weston, Inc., intervenor.

No appearance by plaintiff Umatilla County.

Decision for defendant rendered May 3, 1993.

### CARL N. BYERS, Judge.

This matter is before the court on plaintiff's Motion for Reconsideration. The court allowed oral and written arguments by the parties and *amici curiae*.

Plaintiff and *amici curiae* contend the court erred in holding that ORS 308.411(2) results in an elected value which is or may be different from true cash value. They believe the value intended by the legislature and directed by the statute is true cash value.[6] They argue that the court must look at all of ORS 308.411 and consider it in context. The court finds that such an examination does not change its opinion.

## DETERMINING TRUE CASH VALUE

The legislative directive to value an industrial plant at its true cash value is found in ORS 308.411(1).[7] That subsection states:

---

[6] Due to the adoption of Article XI, section 11b, of the Oregon Constitution, ORS 308.411 was amended in 1991 to specify real market value.

[7] Unless otherwise noted, all references to Oregon Revised Statutes and Oregon Administrative Rules are to the 1983 Replacement Part.

*"Except as provided in subsections (2) to (9)* of this section, an industrial plant shall be valued for ad valorem tax purposes under ORS 308.205, 308.232 and 308.235 at its true cash value utilizing the market data approach (sales of comparable properties), the cost approach (reproduction or replacement cost of the plant) or the income approach (capitalization of income) or by *two or more approaches."* (Emphasis added.)

The exception clause implies that if the election is made and subsections (2) through (9) are applicable, the assessed value of the property may not be true cash value. The statutes referred to, ORS 308.205, 308.232 and 308.235, are all directed at true cash value. If the election is made, the value will not be established in accordance with those statutes.

■ ORS 308.411(2) raises a fundamental problem. True cash value or market value[8] is the value at which property would change hands in the marketplace between knowledgeable parties. An appraiser's use of the three approaches to value is merely an attempt, in an organized and somewhat scientific way, to estimate that value. Since the marketplace does take into consideration the income approach and any detectable functional or economic obsolescence, excluding consideration of such matters cannot result in an estimate of market value. An appraiser who followed subsection (2) and yet claimed the result represented true cash value would be in gross violation of established professional standards.

## REEXAMINATION OF ORS 308.411

■ At plaintiff's urging, the court has reexamined ORS 308.411. That examination does not show the legislature intended or believed the election would result in true cash value. This conclusion is based upon the language used by the legislature in the various subsections.

---

[8] OAR 150-308.205-(A)1.a. defines market value as follows:

"Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

*Subsection (3)*

In subsection (3), the plant owner gives notice of election "to have the plant valued in accordance with subsection (2)." It does not provide that the owner elects to have the plant valued at its true cash value. Rather, the election is to have the plant valued by methods which do not result in true cash value.

*Subsection (4)*

In subsection (4), if the plant owner does not make the election, the owner must give the department information "needed to determine true cash value." This language recognizes that without certain information the department will be unable to determine true cash value. If the owner is able to withhold essential information, the legislature must have recognized that the result would not be true cash value.

*Subsection (5)*

Subsection (5) prohibits the electing owner from introducing evidence relating to the use of the income approach or the allowance of functional or economic obsolescence. This prevents the owner from introducing evidence which would establish true cash value.

*Subsection (6)*

In subsection (6), if an owner is dissatisfied with the election, the owner can request the department to "revalue the plant for the next assessment year using the appraisal methods set forth in subsection (1)." Since subsection (1) specifies that the goal is true cash value using all three approaches, the implication is that the elected value under subsection (2) is something else.

*Subsection (7)*

Subsection (7) allows the plant owner to request a conference with the department or assessor after a physical reappraisal of the plant or an appraisal is updated for use in a subsequent year. This subsection does refer to the "determination of true cash value," but it is not limited or directed to electing owners. Any industrial plant owner may request a conference. Therefore, the subsection indicates nothing about the legislature's intent with regard to the elected value.

*Subsection (8)*

Subsection (8) permits an electing plant owner to withhold income and expense information from use in an income approach or for determination of functional or economic obsolescence. This subsection seems to assume that obsolescence is calculated or based on income and expense information. While it may be read to imply that obsolescence not based on the withheld information may be considered, that inference runs counter to the express language of subsection (2). The thrust of this subsection is *not* to set forth why the income approach and obsolescence can or cannot be considered, but to define the scope of the protection enjoyed by the plant owner.

*Subsection (9)*

■ Subsection (9) specifies that "[i]n no event shall the application of subsection (2) of this section operate to value an industrial plant below its true cash value for ad valorem tax purposes under ORS 308.205, 308.232 and 308.235." Again, this seems to be a recognition by the legislature that the values established under ORS 308.205, 308.232 and 308.235 are different from the value arrived at under subsection (2). This language also suggests that true cash value is the lowest possible value, not the highest. Subsection (9) further provides that the election:

> "[S]hall constitute an *irrevocable waiver* of any subsequent claim that the failure of the assessor or the department to consider the income approach or functional or economic obsolescence resulted in a *valuation in excess of the true cash value* of the plant under ORS 308.205, 308.232 and 308.235." ORS 308.411(9) (emphasis added).

This is an express recognition and a warning to owners that the election could result in an assessed value which exceeds true cash value.

■ To summarize: In the absence of an election, the assessor or the department is to use all three approaches to find true cash value. Where the owner makes the election, only two approaches can be used and neither functional nor economic obsolescence can be considered. With these elected constraints, the only rational conclusion consistent with appraisal theory is that the elected value is something other

than true cash value. An industrial plant without any functional or economic obsolescence would be extremely rare. Consequently, it would be extremely rare that an elected value would ever be the same as true cash value.

## LEGISLATIVE HISTORY

*Amici curiae* argue that the legislative history shows the intent was only to protect confidential information. They conclude that the court should interpret the statute to exclude only express or specific calculations of functional or economic obsolescence. They interpret the statute so that implied or general estimates of obsolescence which are not based on confidential information can be taken into consideration. The court cannot accept this position.

■ If the legislature intended to distinguish between obsolescence based on confidential information and obsolescence based on other information, it did not express that intent in the statute. For the court to make that distinction, it would have to add words to the statute, something the legislature expressly prohibits. ORS 174.010. The court has examined the legislative history of ORS 308.411 and found nothing to indicate an intent to distinguish obsolescence based on the methods by which it is measured.

## COURT RULINGS

Plaintiff acknowledges that the legislature did not delve into the details of appraising. The court, however, must delve into the details when deciding cases. If appraisers estimate items of obsolescence, whether in general terms or incorporated into other concepts, the court must take such matters into consideration in determining which estimates are most accurate. Leaving out details in estimates of obsolescence or related factors does not somehow remove the elements of obsolescence. For example, an appraiser who folds functional obsolescence into the appraisal by estimating the useful life of equipment does not remove functional obsolescence from consideration. The appraiser merely makes it more difficult for the court to consider it. *See Publishers Paper Co. v. Dept. of Rev.*, 270 Or 737, 748-49, 530 P2d 88 (1974).

Plaintiff argues that the court's ruling in this case essentially overrules *Johnson v. Dept. of Rev.*, 10 OTR 218 (1985). Plaintiff contends that *Johnson* was a correct interpretation of the statute and that the present decision goes too far. However, *Johnson* focused on ORS 308.411(5) and what evidence was to be excluded. Based on the court's experience and analysis since *Johnson*, it now reluctantly[9] concludes that to the extent that *Johnson* is inconsistent with the opinion herein and this order, it is overruled.

It is worth emphasizing that the statute not only applies to appraisers, but also forbids the court from taking functional and economic obsolescence into consideration. If appraisers use estimates of useful life in a cost approach or estimates of functional obsolescence in a sales comparison approach, the court must take those factors into consideration to resolve the differences between the appraisers' opinions. This is clearly prohibited by the statute. The statute specifies that the value will be set without taking functional or economic obsolescence into consideration.

Based on the above, the court finds that plaintiff's Motion for Reconsideration should be denied. Now therefore,

IT IS ORDERED that plaintiffs' Motion for Reconsideration is denied.

---

[9] Plaintiff points out that many plant owners relied on *Johnson* to their detriment. If now overruled, it will be to their great disadvantage. The court regrets this, but as plaintiff acknowledges, that point must be a minor consideration in interpreting the statute.