IN THE OREGON TAX COURT
MAGISTRATE DIVISION

PORT OF UMATILLA,
HERMISTON FOODS, INC.,
(Owned by Norpac Foods, Inc.)
*Plaintiff,*

*v.*

UMATILLA COUNTY ASSESSOR,
*Defendant,*

*and*

DEPARTMENT OF REVENUE,
*Intervenor-Defendant.*

(TC-MD 980270 (Control))

PORT OF UMATILLA,
HERMISTON FOODS, INC.,
(Owned by Norpac Foods, Inc.)
*Plaintiff,*

*v.*

UMATILLA COUNTY ASSESSOR,

*and*

DEPARTMENT OF REVENUE,
*Defendants.*

(TC-MD 983073A)

David Canary, Garvey, Shubert & Barer, Portland, argued the cause for Plaintiff.

Shirley Winburn, Assessment Manager, Umatilla County Assessment and Taxation, filed an Answer but did not argue the cause for Defendant Umatilla County Assessor.

James Wallace, Assistant Attorney General, Department of Justice, Salem, filed an Answer in Intervention and argued the cause for Intervenor-Defendant Department of Revenue.

Decision rendered November 16, 1999.

### SCOT A . SIDERAS, Presiding Magistrate.

At issue is the assessment, for the 1997-98 and 1998-99 tax years, of a Norpac, Inc., facility located in Hermiston and identified by Account Nos. 128251, 148052, and 152568.[1] The disputed components of value include the buildings, site improvements, machinery, and equipment.[2]

Plaintiff was represented by its counsel, David Canary. Its appraisal witnesses included Don Gwyther, Larry Tapanen, and, as an adverse witness, Dan Watson. The balance of Plaintiff's testimony came from Julie Schmacher, its financial accounting assistant, and James Summers, its technical service manager.

---

[1] Account numbers 148052 and 152568 designate leased property.

[2] Land, mobile equipment, licensed vehicles, office equipment, and furniture are among the items not contested.

Intervenor-Defendant (Defendant) appeared through James Wallace, Assistant Attorney General. Mike Buchanen presented Defendant's appraisal.

Plaintiff elected to have the property appraised without reference to the income approach. ORS 308.411.[3]

## STATEMENT OF FACTS

This plant was built in 1990 to quick freeze asparagus, carrots, lima beans, red potatoes, and a variety of peas and package them into bulk containers. In addition to the equipment lines there are four freeze tunnels, a dry storage warehouse, a receiving area, an office and lunchroom space, and a working cold storage room with a capacity of 1,500 tons. That cold storage area is not adequate for the facility's needs. An indispensable part of Plaintiff's operations require trucking its products to and from an Americold freezer storage plant some five miles distant.

The total real market value of the property on the roll is $9,658,760.[4] Plaintiff argues that value is in error, and that a more accurate estimate is on the order of $6,600,000. Plaintiff reached that conclusion through a cost approach. Following the determination that the buildings, structures, and yard improvements had a depreciated replacement cost of $3,623,705, Plaintiff's appraiser valued the machinery and equipment through the used equipment market, investigating the cost of replacing each item and adding the necessary components of freight, equipment hours, engineering, and installation. From that total of $2,455,200 Plaintiff went on to identify additional, specific functional obsolescence totaling $1,300,000.

There were three components to the element of functional obsolescence. The first is the annual additional operating expense, at $50,000 of trucking the products back and forth from the Americold freezer plant.[5] Plaintiff, using 20

---

[3] All references to Oregon Revised Statutes (ORS) are to 1995.

[4] That number is taken from the tax statement as to Account No. 128251. Plaintiff's Exhibit 3, page 2, lists a slightly lower total, at $9,575,150, as it is based on Defendant's July 1, 1996, appraisal.

[5] Summers, Plaintiff's technical service manager with 30 years of experience in the foods product industry, testified that frozen food processors which prepare

years at a rate of 10 percent, calculated an adjustment of approximately $350,000.[6] The second was the increased maintenance costs and shorter life expectancy of the roof, caused by an installation of a membrane system inadequate for the wind loads[7] and the caustic effect of the discharges from the air coolers associated with the carrot line.[8] Plaintiff's adjustment was $225,000. The third was that the automated systems for sorting produce were not able to function as fast as the line requires, necessitating the hiring of employees to perform this function at an annual labor cost, across all products, of $217,869.[9] A $700,000 adjustment was proposed to account for this factor.

Defendant's appraisal, like Plaintiff's, used a cost approach. There were significant differences. Plaintiff treated the buildings and structures as "low cost." In its appraisal Defendant choose to use the category of "average."[10] Other divergence came from each party's different estimate of total depreciation, with Plaintiff using 23 percent

---

produce for bulk processing typically have larger frozen storage than the subject property.

[6] Defendant objected to that evidence, asserting that Plaintiff, as an electing taxpayer under ORS 308.411, was unable to use that method of demonstrating obsolescence.

[7] The annual expense of repairing the roof due to wind damage was placed by Summers at $3,000 to $4,000 exclusive of repairs done under warranty. For 1996 the expense was $22,000.

[8] The solution is to replace air coolers with water coolers. Plaintiff has already replaced one six-ton unit. Replacing the remaining six-ton and ten-ton units was said to cost between $200,000 and $250,000 each. Summers testified that the resale value of the air coolers would be 25 percent or less.

[9] Two dozen extra inspectors were required to sort the carrots. That excess labor cost could be cured by replacing the Opti-Sort scanner. A similar situation exists as to the processing of peas, sugar snap peas, and lima beans, where 66 inspectors are required to supplement the existing Elbiscan machine. Those excessive labor costs could be eliminated by replacing both of the existing scanners with two Key Tegras, at a total cost of $700,000.

[10] Defendant referenced the electrical service, drainage system, plumbing, and temperature controls as elements pointing to a higher classification. Plaintiff spoke about the minimal lighting, few bays, shed roof, and intermittent painted surfaces as evidence to the contrary, and noted that it included the elements recited by Defendant as components of the machinery and equipment.

[11] The difference as to depreciation is especially pronounced as to the yard improvements. Plaintiff assigned a shorter useful life, while Defendant apparently applied the same rate as to the buildings.

as against Defendant's 17 percent.[11] The effect of both distinctions is a difference of $866,805.[12]

The next significant difference between the two appraisals was Defendant's decision to rely on a trended investment cost method. Defendant toured the plant using Plaintiff's list of reported assets.[13] Each item's original cost was trended to the assessment date, and then depreciated, for a total depreciated replacement cost new of the machinery and equipment of $5,059,000 or approximately twice that calculated by Plaintiff. In defense of that method, Defendant pointed out that Plaintiff's resort to the used equipment market is confounded by auction sales, and testified to instances where its own measures of the used equipment market either contradicted[14] or confirmed[15] the values used in Plaintiff's analysis.

Defendant likewise reached differing estimates as to the components of functional obsolescence, although it did allow additional depreciation as to the roof and capitalized the additional maintenance required due to the air coolers. The functional obsolescence attributable to the inadequate cold storage space was placed at $67,430, an amount lesser than Plaintiff's due to Defendant's decision that only the element of trucking, and not handling, could be included in the calculation. Defendant reached a similar conclusion as to the sorters, agreeing that they are functionally obsolete in that they cannot inspect the product at the speed with which the line must move, but reaching a conclusion that a lower adjustment of $538,478 was appropriate.[16]

In this comparison of the differences between appraisal methodology special attention was paid to the

---

[12] The total used for Defendant's estimation of the value of the buildings, structures, and yard improvements was $4,495,010. That number came from the testimony of Buchanen and differs from that set out in Plaintiff's Exhibit 3.

[13] The list ran to some 600 items. In its tour of the facility Defendant made some 50 corrections.

[14] Plaintiff's rebuttal was that the steam peeler and scanner referred to by the defense were different machines than the ones present in the plant and discussed by Plaintiff's appraiser.

[15] As in the instance of an optical sorter.

[16] Defendant's lower estimate was due principally to attributing a larger element of value to the obsolete scanners.

background of the appraisers. Key appraisal testimony was provided for Plaintiff by Larry Tapanen. Tapanen had provided appraisals for Norpac, Inc., and its corporate predecessor from 1964 onwards. In 1975, Tapanen completely inventoried all of Norpac's facilities and established a system, still in place through the time of trial, for identifying, inventorying, and monitoring all of Norpac's equipment.

The implication of that system for the property at issue is that in 1991, when the plant was being constructed, Tapanen was requested by Norpac, Inc., to compose its fixed asset list. Some items were purchased new for the plant. Others were transferred to the facility from some of Norpac's other operations. Accurate distinction between the new and used items was essential, for this was an enterprise zone property.[17] Tapanen's recollection, notes, and contemporaneous report show over half of the assets at the facility were not new items.[18] As a demonstration Tapanen referenced the asset numbers on Norpac's fixed asset system, noting that assets with a 30,000[19] sequence were new and that only about half of the line items have asset numbers under 30,000. Further demonstration came from efforts to trace the history of asset numbers. Identifying approximately 30 items, the process showed assets originally acquired as early as 1960 were transferred to the facility.

## ANALYSIS

The question to be resolved in this appeal is which appraisal most persuasively demonstrates the value, consistent with an ORS 308.411 election, of this property. Plaintiff contends the total real market value of the property is

---

[17] *See* ORS 285B.650 *et seq.* The 1991 enterprise zone application found a total estimated value for the facility of $10,137,157.89, approximately half of which was attributable to buildings, structures, and yard improvements. Since that time a fourth freeze tunnel and a second steam boiler have been added, along with other changes to the processing lines. For those reasons the court does not deem the 1991 enterprise zone application estimated value as probative for the year at issue.

[18] That percentage was disputed by Defendant. After weighing the testimony of Plaintiff's witnesses and considering the cross examination of Buchanen, the court finds Plaintiff's assertion to be supported by the facts.

[19] Although Plaintiff's Exhibit 4, page 1 refers to a 3,000 numbering sequence, Tapanen's examination, and Plaintiff's Exhibit 2, confirm the 30,000 numbering sequence.

$6,550,605 with $3,623,705 attributable to the buildings, structures, and yard improvements and $2,926,900 to the machinery and equipment.[20] Defendant argues that the real market value of the property is $8,424,610 with $4,490,510 attributable to the buildings, structures, and yard improvements and $3,934,100 to the machinery and equipment.

█ The only legal question that must be resolved in order to decide this controversy is Defendant's objection to the use of expense data to demonstrate functional obsolescence, on the reasoning that method is precluded by ORS 308.411. That objection is overruled. Both legislative testimony as to ORS 308.411, and a previous decision of this court, support the conclusion that the consequences of an election are to exclude the income approach entirely, but not the use of income and expense data in conjunction with the cost and sales comparison approaches. *See J.R. Simplot Co. v. Dept. of Rev.,* 12 OTR 391, 394-95 (1993), *rev'd on other grounds,* 321 Or 253, 897 P2d 316, and the authorities referenced therein.[21]

The remaining issues, while somewhat complicated, involve factual determinations as to the value of the buildings, structures, and yard improvements; the value of the machinery and equipment before any functional obsolescence adjustment; and the amount of functional obsolescence. All those areas involve weighing the opinions of individuals of considerable expertise arguing disparate conclusions, often from the same information.

That situation is especially clear as to the valuation of the buildings, structures, and yard improvements. Each appraiser studied all the buildings, structures, and yard improvements. Both appraisers turned to the same established valuation service for the determination of replacement

---

[20] The discrepancy between those numbers and Plaintiff's Exhibit 3 is explained through the testimony of Buchanen, 16 OTR at 176 n 11, and the fact that the uncontested value of the leased freezer tunnels must be added to Plaintiff's numbers so as to balance the comparison.

[21] The court notes that matter was presented only as an ORS 308.411 election issue. There was no debate here as to whether Plaintiff provided accurate information to Defendant. In fact Defendant used Plaintiff's information to reach a disparate conclusion, as has been discussed with reference to the adjustment for inadequate cold storage.

cost new. Despite those similarities, their opinions differ by some 20 percent, due to Plaintiff's conclusion that the buildings are best categorized as "low cost" and carry greater depreciation as against Defendant's assertion that the buildings are "average" and show lesser depreciation.

It is difficult to chose between the two. The reasoning of the court is, however, that Plaintiff's case is the most persuasive. Plaintiff, as to the categorization of the property, presented the case that the buildings and structures had a shed roof, few bays, and that the electrical, plumbing, and temperature controls pointed to by Defendant as elements arguing for a higher categorization were included as pieces of the specific machinery and equipment to which they pertain. That contention was not rebutted by Defendant.[22] Although depreciation is an even more difficult choice, the court again endorses the 23 percent used by Plaintiff as against the 17 percent of Defendant. The problems associated with the roof and the air cooler exhaust, while accommodated through a functional obsolescence adjustment, are indicative of a facility experiencing greater, rather than lesser, wear. Although not an overwhelming point, the court also notes that Defendant appears to have applied its depreciation adjustment in a mechanical fashion, applying the same number to yard improvements as well as substantial buildings.[23]

The next challenge to the court is choosing between Plaintiff's used equipment approach and Defendant's trended investment cost method. In its evaluation the court is struck by the quality of each appraisal. Both appraisers carefully inspected the premises, interviewed plant personnel, and then turned to the market. The difference is that Plaintiff relied on the used equipment market, adding to the

---

[22] Absent a showing by Defendant, especially in the face of the specific testimony of Gwyther to the contrary, the court will not presume that a "low cost" category is incompatible with the cleanliness requirements of bulk food processing.

[23] The court notes that it does not find persuasive Plaintiff's argument that the annual trending applied to the property supports its contention as to depreciation. Annual trending includes, in addition to the adjustment for depreciation and any obsolescence, a factor to trend the facility to a current market value. Such a practice confounds the attempt to demonstrate depreciation by means of accumulated trending.

acquisition cost of each item the necessary additional components to integrate each item into an operating facility. Defendant, on the other hand, referred to the market to trend each item to the assessment date, with the subtraction of accumulated depreciation. In that contrast of presentations the court is struck with the conclusion that it is the character of the method that makes Plaintiff's presentation the most persuasive.

■　　Testimony from a variety of sources identified that much, probably well over half, of the disputed assets are old. It has been reliably established that in 1991 this plant was built with used equipment transferred from other Norpac facilities. That date was almost a decade ago. That conclusion suggests that the method using reproduction cost new is less reliable due to the large adjustment required for depreciation, and makes it more likely that the condition of the disputed assets is comparable to what is available on the used equipment market. The court is certainly attuned to Defendant's point that Plaintiff, in measuring the used equipment market, must avoid information from auction, liquidation, or distress sales.[24] However, Plaintiff's appraiser credibly testified that he took such precautions when he measured the market. Moreover, in the choice between methods, the court's decision is that it is less difficult to strain out used equipment sales that do not genuinely measure the market than it is to determine the replacement cost new of old and sometimes obsolete items. A guide to this thinking is found in *Hyster Co. v. Dept. of Rev.*, 10 OTR 101 (1985).

■　　There remains the matter of the additional subtractions for functional obsolescence. Defendant proposed to adjust for the absence of adequate frozen storage by a subtraction that only recognized the expense of trucking the product the five miles back and forth from the plant. That sum is inadequate. The court is instead persuaded by Plaintiff's argument that moving multiple totes of vegetables into a truck, from the truck to the freezer, from the freezer to the truck, and off the truck back into the plant, involves significantly greater handling than acknowledged by Defendant. On the other hand the court is convinced by Defendant that

---

[24] *See* OAR 150-308.205-(D)(2)(f).

Plaintiff's functional obsolescence adjustment for the excess labor costs caused by the inadequate sorters must be reduced by salvage value, and so finds the appropriate subtraction to be $575,000[25] rather than Plaintiff's original figure of $700,000. Finally, given the difficulties of determining the salvage value for used air coolers, the demonstrated effect of caustic discharges upon the roof membrane, and the history of maintenance expenses due to an installation inadequate for regional wind loads, the court endorses Plaintiff's, rather than Defendant's, adjustment for the remaining element of functional obsolescence.[26]

From this analysis the court finds the value of the property subject to this appeal to total $6,725,000 for the 1997-98 tax year.

## CONCLUSION

IT IS THE DECISION OF THIS COURT that Defendants shall correct their records, including the assessment and tax rolls, to reflect the value of $6,725,000 for the 1997-98 tax year. Any refund due following this correction is to be promptly paid with statutory interest pursuant to ORS 311.806 and ORS 311.812. The rolls for the subsequent tax years shall be revised as required by ORS 309.115.

IT IS FURTHER DECIDED that on the court's own motion this matter is hereby consolidated. The title of the case is amended as set forth in the caption of this Decision.

---

[25] That number is slightly higher than Defendant's proposal of $538,478. Although the appraisal testimony on that point was important, the court found Summer's firsthand knowledge of scanner values especially valuable.

[26] Again, Summer's testimony was a key element leading to the court's conclusion.